# United States Court of Appeals for the Federal Circuit

2009-1113


TOTES-ISOTONER CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.


John M. Peterson, Neville Peterson LLP, of New York, New York, argued for plaintiff-appellant. With him on the brief were Michael T. Cone, Maria E. Celis, and Matthew G. Shaw.

Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Tony West, Assistant Attorney General, Reginald T. Blades, Jr., Assistant Director, and Aimee Lee and David S. Silverbrand, Trial Attorneys. Of counsel on the brief were Karen P. Binder, Assistant Chief Counsel, and Yelena Slepak, Attorney, United States Customs and Border Protection, of New York, New York, and Elizabeth Baltzan, Office of the General Counsel, United States Trade Representative, of Washington, DC.

Curtis W. Knauss, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, New York, for amicus curiae Wolff Shoe.

Appealed from: United States Court of International Trade

Chief Judge Jane A. Restani, Judge Donald C. Pogue, and Judge Judith M. Barzilay

# United States Court of Appeals for the Federal Circuit

2009-1113

TOTES-ISOTONER CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of International Trade in case no. 07-00001, Chief Judge Jane A. Restani, Judge Donald C. Pogue, and Judge Judith M. Barzilay.

———————————————

DECIDED: February 5, 2010

———————————————

Before LOURIE, DYK, and PROST, <u>Circuit Judges</u>.

Opinion for the court filed by <u>Circuit Judge</u> DYK. Opinion concurring in the result filed by <u>Circuit Judge</u> PROST.

DYK, <u>Circuit Judge</u>.

Totes-Isotoner Corporation ("Totes") appeals from a judgment of the United States Court of International Trade dismissing its complaint against the United States for failure to state a claim. Totes alleged that the Harmonized Tariff Schedule of the United States ("HTSUS") unconstitutionally denies the equal protection of the laws by imposing different rates of duty on seamed leather gloves "for men" and seamed leather gloves "for other persons." <u>See</u> <u>Totes-Isotoner Corp. v. United States</u>, 569 F. Supp. 2d 1315, 1319 (Ct. Int'l Trade 2008) ("<u>Totes I</u>"). We affirm.

BACKGROUND

Totes is a United States importer of men's seamed leather gloves. As an importer of goods, Totes is required to pay import tariffs as set forth in the HTSUS. Subheading 4203.29.30 of the HTSUS classifies "[m]en's" leather gloves and provides for a duty rate of 14 percent ad valorem, whereas gloves "[f]or other persons" are classified under 4204.29.40 and 4203.29.50, HTSUS, which provide for a duty rate of 12.6 percent ad valorem. The relevant portions of the HTSUS are set forth below:

| 4203 | | Articles of apparel and clothing accessories, of leather or of composition leather: |
|---|---|---|
| . . . | | |
| | | Gloves, mittens and mitts: |
| . . . | | |
| 4203.29 | | Other [than those for sports]: |
| . . . | | |
| | | Other [than horsehide or cowhide (except calfskin) leather]: |
| . . . | | |
| | | [Seamed]: |
| 4203.29.30 | | Men's................................................14% |
| | 10 | Not lined ............... doz. prs. |
| | 20 | Lined .................... doz. prs. |
| | | For other persons: |
| 4203.29.40 | 00 | Not lined ............... doz. prs. ........12.6% |
| 4203.29.50 | 00 | Lined .................... doz. prs. ........12.6% |

Totes filed a complaint with the Court of International Trade, which has "exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . revenue from imports or tonnage." See 28 U.S.C. § 1581(i)(1). In its complaint, Totes alleged that by imposing different tariff rates for "[m]en's" gloves and "other" gloves, the HTSUS "unlawfully and unconstitutionally discriminate[s] on the basis of gender or age." See Complaint at 1, Totes I, 569 F.Supp.2d 1315 (No. 07-00001). Totes sought a refund of

duties "unconstitutionally exacted in liquidation under HTSUS Subheading 4203.29.30." Id. at 7.

The government filed a motion to dismiss on various grounds. In a decision dated July 3, 2008, the Court of International Trade concluded that Totes' equal protection claims were justiciable and that Totes had standing to bring its claims. See Totes I, 569 F. Supp. 2d at 1319. Nonetheless, the court dismissed Totes' complaint for failure to plead facts sufficient to state a claim of unconstitutional discrimination. The dismissal was without prejudice as to the filing of an amended complaint. Id. Both Totes and the government sought reconsideration. On reconsideration, the government also argued that the court lacked jurisdiction because Totes failed to exhaust its administrative remedies, having failed to invoke the Court of International Trade's jurisdiction under 28 U.S.C. § 1581(a) by filing a protest with the United States Customs Service ("Customs"). On November 4, 2008, the court denied both parties' motions for rehearing. See Totes-Isotoner Corp. v. United States, 580 F. Supp. 2d 1371, 1374 (Ct. Int'l Trade 2008) ("Totes II"). Totes chose not to amend its complaint, and the court accordingly dismissed the complaint with prejudice. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

### I Jurisdiction and Related Questions

The government argues that the Court of International Trade did not have jurisdiction to entertain this action, that Totes lacks standing, and that this controversy is non-justiciable. These are questions of law which we review de novo. Int'l Custom Prods., Inc. v. United States, 467 F.3d 1324, 1326 (Fed. Cir. 2006).

A  Jurisdiction Under 28 U.S.C. § 1581(i)

In arguing that the Court of International Trade lacked jurisdiction under 28 U.S.C. § 1581(i), the government points out that jurisdiction under section 1581(i) is not available if jurisdiction is available under other subsections of 1581, and argues that section 1581(a) would have been available if Totes had filed a protest.[1]  We disagree. It is 28 U.S.C. § 1581(i), the residual jurisdiction provision, and not 28 U.S.C. § 1581(a) that provides the jurisdictional mechanism for a challenge to the constitutionality of a tariff.  In Thomson Consumer Electronics, Inc. v. United States, 247 F.3d 1210, 1215 (Fed. Cir. 2001), we held that filing a protest with Customs under section 1514(a), which is a prerequisite to jurisdiction under section 1581(a), was not required where a plaintiff challenged the constitutionality of a tariff pursuant to section 1581(i).  This was so because section 1581(a) did not provide a remedy.  We reasoned that there is no protest remedy available to one challenging an unconstitutional statute because Customs lacks the power to declare a statute unconstitutional.  See id.; see also Orleans Int'l, Inc. v. United States, 334 F.3d 1375, 1380 (Fed. Cir. 2003); U.S. Shoe

---

[1]  Under 28 U.S.C. § 1581(i),

the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States . . . that arises out of any law of the United States providing for . . . revenue from imports or tonnage . . . [and their] administration and enforcement . . . .

28 U.S.C. § 1581(a) provides that

[t]he Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930.

Corp. v. United States, 114 F.3d 1564, 1569-71 (Fed. Cir. 1997), aff'd, 523 U.S. 360 (1998).

However, the government relies on United States v. Clintwood Elkhorn Mining Co., 128 S. Ct. 1511 (2008), and suggests that Clintwood has effectively overruled Thomson. In Clintwood, a taxpayer claimed that the government had unlawfully imposed a tax on exports and sought a refund. 128 S. Ct. at 1515. The taxpayer had not, however, filed a claim for refund with the IRS and the statute, 26 U.S.C. § 7422, provided that "[n]o suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected . . . until a claim for refund or credit has been duly filed with [the IRS]." See Clintwood, 128 S. Ct. at 1516. In holding that the statute required initial resort to the IRS, the Supreme Court did not address whether the IRS could in fact provide a refund by declaring the tax unconstitutional. The Court held that exhaustion was required in all circumstances. But the language of the exhaustion provision in Clintwood, as the Supreme Court noted, was "unusually emphatic." Id. ("Five 'any's' in one sentence and it begins to seem that Congress meant the statute to have expansive reach."). There is no similar provision here unequivocally requiring resort to the protest procedures and section 1581(a). We conclude that Clintwood does not alter our holding in Thomson, and that the Court of International Trade properly exercised jurisdiction under section 1581(i).

## B Standing

The government also argues that Totes lacks standing to maintain this action. Totes must demonstrate that its claim meets Article III of the Constitution's "case or

controversy" requirements.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  To establish Article III standing, Totes must demonstrate (1) that it has suffered an injury-in-fact; (2) that there is a causal connection between the government's conduct and its injury-in-fact; and (3) that its injury is redressable by the court.  See id. Totes alleges that it has suffered an injury-in-fact—the payment of customs duties at the 14 percent rate.  Totes also alleges that this injury is caused by the government's allegedly discriminatory tariff rates, and seeks refund of any excess duty paid.  These allegations typically would satisfy constitutional standing requirements.  See, e.g., U.S. Shoe, 523 U.S. at 365-66, 370.

The government argues that since all importers of "[m]en's" gloves, including Totes, pay the same tariff rate, there is no discriminatory treatment and that Totes has suffered no injury-in-fact.  This argument is frivolous.  Equal protection requirements still apply even though everyone in the targeted group is targeted equally.  See Loving v. Virginia, 388 U.S. 1, 9 (1967) ("[E]qual application [of Virginia's miscegenation statute] does not immunize the statute from the very heavy burden of justification which the Fourteenth Amendment has traditionally required of state statutes drawn according to race.").

The government also argues that if there is any discrimination, it is against the purchasers of gloves, and not the importers of gloves.  However, the Supreme Court has held that a vendor may indeed be the proper plaintiff where the vendor itself is injured by the alleged discrimination, even though the vendor is not the object of the discrimination.

In Craig v. Boren, the Supreme Court held that a beer vendor had third-party

standing to pursue the equal protection claims of 18-20-year-old males against an allegedly discriminatory statute that permitted purchases of 3.2% beer by 18-20-year-old females but denied 18-20-year-old males that same right. 429 U.S. 190, 194-97 (1976). The Court noted that "[t]he operation of [the statutes at issue] plainly has inflicted 'injury in fact' upon appellant sufficient to . . . satisfy the constitutionally based standing requirements imposed by Art. III." Id. at 194. Here, the importer, like the "vendor [in Craig, is] the obvious claimant." See id. at 197. A third party, such as Totes, can claim jus tertii standing only when (1) the jus tertii plaintiff and the party whose rights it is asserting have a close relationship; (2) the jus tertii plaintiff has suffered an injury in fact; and (3) there is some hindrance to the first party filing its own claim. Powers v. Ohio, 499 U.S. 400, 410-11 (1991). Here, those requirements are satisfied. There is a close relationship between importers and purchasers. Importers suffer an injury in fact as they are legally required to pay the allegedly discriminatory tariff. The purchasers have no remedy to challenge the tariff classification.[2]

In addition to Article III standing requirements, Totes must also meet prudential standing requirements. To satisfy prudential standing requirements, the interests of the affected parties must also arguably be within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. See Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 396 (1986). The interests of the purchasers of gloves in being free from unconstitutional sex discrimination are plainly within the zone of

---

[2] Totes has stated that it did not and does not currently seek derivative or third-party standing on behalf of adult male purchasers of gloves. See, e.g., Totes I, 569 F. Supp. 2d at 1324 n.10. However, in our view, Totes' standing is by its nature, derivative, and this Court evaluates it as such.

interests to be protected by the Equal Protection Clause. Therefore, we conclude that Totes has standing to pursue its equal protection claims.

## C Political Question Doctrine

Finally, the government argues that Totes' complaint raises a non-justiciable political question. The political question doctrine excludes certain disputes from judicial determination where the subject matter of the dispute is exclusively assigned to the political branches or where such branches are better-suited than the judicial branch to resolve the matter. See Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986); Baker v. Carr, 369 U.S. 186, 210-11 (1962). The government argues that the subject matter of Totes' complaint—the constitutionality of the use of gender in tariff classifications—is not appropriate for judicial resolution because the formation and adoption of tariff provisions involve the negotiation of agreements with foreign governments and that there are no judicially manageable standards for reviewing the results of such international trade agreements. In other words, in the government's view, "[t]he changes in the tariff rates that Totes requests the courts to impose would intrude upon the foreign affairs powers of the political branches by undermining both the specific bargain the President struck and the grounds upon which Congress approved the overall [trade] agreement." Def.-Appellee's Br. 14. We disagree.

As the Court of International Trade noted, though the challenged provisions of the HTSUS originated in international negotiations, they have since been enacted by Congress as statutes comprising the HTSUS.[3] The Supreme Court remarked in Japan

---

[3] The specific provisions of the HTSUS constitute statutes enacted by Congress pursuant to section 1204(c) of the Omnibus Trade and Competitiveness Act

2009-1113                                    8

<u>Whaling</u> that despite the political question doctrine, "the courts have the authority to construe treaties and executive agreements, and it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts." 478 U.S. at 230. The same is true about rulings on the constitutionality of statutes based on the application of the Fifth Amendment's equal protection requirement.

None of the cases cited by the government remotely holds or even implies that the federal courts are barred by the political question doctrine from reviewing federal statutes for compliance with equal protection guarantees. To the extent that the cases address the ability of courts to review federal statutes for compliance with established constitutional standards, they recognize the authority and duty of the federal courts to conduct that review. For example, in <u>Made in the USA Foundation v. United States</u>, 242 F.3d 1300 (11th Cir. 2001), the Eleventh Circuit specifically recognized that, even with respect to international agreements,

> 'foreign commitments' cannot relieve the government of the obligation to 'operate within the bounds laid down by the Constitution,' and that 'the prohibitions of the Constitution . . . cannot be nullified by the Executive or by the Executive and Senate combined.' <u>Reid v. Covert</u>, 354 U.S. 1, 14, 17 (1957). We therefore have little doubt that courts have the authority— indeed, the duty—to invalidate international agreements which violate the express terms of the Constitution.

<u>Id.</u> at 1314.

Therefore, we agree with the Court of International Trade that the political question doctrine is inapplicable. The review of statutory provisions, such as the HTSUS, using constitutional standards, is properly within the realm of the

---

of 1988, Pub. L. No. 100-418, § 1204(c), 102 Stat. 1107, 1149 (codified at 19 U.S.C. § 3004(c)).

judiciary. "[W]e cannot shirk this responsibility merely because our decision may have significant political overtones." Japan Whaling, 478 U.S. at 229-30.

## II Failure to State a Claim

We now turn to the merits. We review the Court of International Trade's decision dismissing the complaint de novo. Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009).

Totes' complaint alleges that the government has assessed, and Totes has paid, customs duties at a rate of 14 percent ad valorem on its men's seamed leather gloves. Totes seeks a refund of these customs duties because the provisions of the HTSUS requiring payment of these duties "unlawfully and unconstitutionally discriminate on the basis or gender or age." Complaint at 1, Totes I, 569 F.Supp.2d 1315 (No. 07-00001). The Court of International Trade found that Totes' complaint failed to state a claim. We agree, but for somewhat different reasons than those articulated by the Court of International Trade.

Before addressing Totes' primary argument on appeal, it is necessary to clear away the underbrush created by two bad arguments—one made by each side in this case. The government argues that Totes cannot allege a constitutional claim because it "is not entitled to a particular [tariff] classification or rate of duty or preference." Def.-Appellee's Br. 32 (citing Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294, 318 (1933); N. Am. Foreign Trading Corp. v. United States, 783 F.2d 1031, 1032 (Fed. Cir. 1986)). But that hardly precludes a claim of unconstitutional discrimination. Totes is not "effectively claiming entitlement to a specific classification and rate of duty." See

id. Totes is complaining about unequal treatment.[4]

Totes argues that the tariff classification is unconstitutional because it discriminates between similar property—men's gloves and women's gloves. While the Supreme Court in Allegheny Coal and other cases has held that taxation of property cannot discriminate between items of property of the "same class," allegations of such discrimination are judged under the rational basis test. See Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster County, 488 U.S. 336, 341-44 (1989); Charleston Fed. Sav. & Loan Ass'n v. Alderson, 324 U.S. 182, 190-92 (1945). The rational basis test is relatively easy to satisfy, and Totes has failed to allege facts sufficient to show that men's and women's gloves are property of the same class. Men's and women's gloves are separate commodities, moving in different channels of trade and presenting different commercial issues with respect to domestic manufacturers.[5]

We turn then to Totes' primary argument—that the tariff provisions at issue unconstitutionally discriminate based on the sex of users of gloves. To properly state a claim for unequal treatment, as with any other claim, a plaintiff must provide "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to

---

[4] The government also appears to suggest that Totes has no right to a refund because the government here could have raised the tariff rate on the gloves for "other persons." The Supreme Court has rejected this as a basis for denying judicial relief. See, e.g., McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco, Dep't of Bus. Regulation of Fla., 496 U.S. 18, 35-36 (1990).

[5] The government observes that historically, "[t]he record particularly reflects sourcing differences; domestic production of men's gloves was higher than for women's gloves, and women's gloves tended to be imported. See Dictionary of Tariff Information, Government Printing Office 379 (1924); Summary of Tariff Information, Government Printing Office, 2058 (1929)." Def.-Appellee's Br. 59.

'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); see Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009).

> While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level . . . .
> . . .[S]uch a claim requires a complaint with enough factual matter (taken as true) to suggest that [a claim is plausible].

Bell Atl., 550 U.S. at 555-56 (citations and footnote omitted).

Applying Bell Atlantic's pleading requirement to Totes' equal protection claim, the Court of International Trade held that the provisions at issue were not facially discriminatory, and therefore, Totes' complaint "must include a factual allegation that demonstrates a governmental purpose to discriminate." Totes I, 569 F. Supp. 2d at 1326, 1328. The court reasoned that Totes "must at least include an allegation that the challenged tariff classifications distribute the burdens of the tax rate imposed in a way that disadvantages one sex as a whole, or has a disproportionate impact based on sex." Id. at 1328.

It may be, as the Court of International Trade suggested, that the tariff does not discriminate between male and female purchasers of gloves because women buy men's gloves for men and men buy women's gloves for women. But this comparison entirely misses the point. The claimed discrimination is based on the sex of the glove users, not the sex of the glove purchasers. There is no serious dispute that men's gloves are typically purchased for use by men, and women's gloves, for women. Indeed the government admits that "the subheadings at issue require Customs to differentiate

between gloves because they are targeted for use by specific genders." Def.-Appellee's Br. 63 (quotation mark omitted). Under the theory of purchaser equality, generally imposing a higher tax on vehicles purchased for female users would raise no constitutional questions if both men and women equally purchased the vehicles in question. Any such theory is untenable. For example, in Califano v. Westcott, the Supreme Court rejected the government's argument that unlawful sex discrimination did not exist because the benefits law did not distinguish between male and female benefits recipients even though the calculation of the benefits was affected by sex-based criteria. 443 U.S. 76, 83-84 (1979). So here, the claimed absence of differential treatment of male and female glove purchasers does not eliminate constitutional concerns concerning sex discrimination. We must accordingly address whether the allegation of disparate impact of the tariff provisions with respect to male glove users is sufficient to create a prima facie case of sex discrimination.[6]

---

[6]    The concurrence suggests that this disparate impact claim is not raised, stating that "Totes's brief to this court focuses entirely on whether the tariff classification is facially discriminatory." Concurring Op. at 2. While the concurrence is correct that Totes primarily argues that the use provisions are facially discriminatory, at places in its brief Totes argues discriminatory "impact." See Pl.-Appellant's Br. 27 (noting that the HTSUS "causes disparate impact based on gender").

In any event, the label that Totes has chosen to describe its claim is not determinative. With respect to pleadings, it is understood that a court looks to "the quality of its substance rather than according to its form or label." 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004). The same approach applies to briefs. See, e.g., Goeke v. Branch, 514 U.S. 115, 118 (1995) (brief adequately raised issue because it provided the "court with ample opportunity to make a reasoned judgment on the issue"); see also Smith v. Texas, 550 U.S. 297, 314 (2007) ("Smith's labeling of the claim in his supplemental brief, however, did not change its substance.").

It is well established that disparate impact standing alone does not establish a violation of equal protection. In <u>Village of Arlington Heights v. Metropolitan Housing Development Corp.</u>, 429 U.S. 252 (1977), the Supreme Court reaffirmed that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact. 'Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination.'" <u>Id.</u> at 264-65 (quoting <u>Washington v. Davis</u>, 426 U.S. 229, 242 (1976)). Similarly, as we noted in <u>Yant v. United States</u>, 588 F.3d 1369, 1373-74 (Fed. Cir. 2009), "[m]ere reliance on gender ratios of two groups [to show disparate impact] does not establish discrimination based on sex." To be sure, the Supreme Court has noted that disparate impact, while not inherently unlawful, supports a finding of purposeful discrimination. <u>See, e.g.</u>, <u>Washington</u>, 426 U.S. at 242 ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another."). In contexts such as jury selection, employment, or fair housing, an allegation of disparate impact may in fact be sufficient to make out a prima facie case of discrimination. <u>See</u> <u>Batson v. Kentucky</u>, 476 U.S. 79, 96-97 (1986); <u>Arlington Heights</u>, 429 U.S. at 266; <u>Washington</u>, 426 U.S. at 241-42. However, we think a different approach is required in the tariff context.

---

The substance of Totes' argument is that the tariff discriminates against male glove users both in theory and in fact and that the occasional use of men's or women's gloves by the other sex (what Totes calls "fugitive" use) does not save the discrimination. <u>See</u> Pl.-Appellant's Br. 13 ("[A] higher duty on gloves imported for men is a discriminatory duty on men for the purposes of equal protection."), 51 ("Even if this Court were to hold that a gender discrimination claim must assert distinctions among people, the tariff provisions at issue do create distinctions among people for purposes of

This is so for two reasons. First, apart from a desire to raise revenue, Congress, in classifying goods for the imposition of tariffs, as a general matter is not concerned with the characteristics of the ultimate retail users of goods, but rather such classifications are designed to promote particular trade policy objectives negotiated with other countries. The current tariff classification system, the HTSUS, which has been in effect since January 1, 1989, is the result of the United States' implementation of a standardized international product nomenclature system based upon the international Harmonized Commodity Description and Coding System ("HS"). See Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, §§ 1201-17, 102 Stat. 1107. 1147-63 (codified at 19 U.S.C. § 3001 et seq.; Generalized System of Preferences (GSP); Publication of the Proposed Conversion of the GSP Program to the Harmonized System Tariff Nomenclature, 51 Fed. Reg. 44,163 (Dec. 8, 1986). The HS, which is administered by the World Customs Organization, and was the result of a ten-year international effort, was developed in order to provide a single modern structure for product classification to be used on an international basis in the classification, description, and coding of goods for customs purposes; for the collection of statistical data on imports and exports; and also for the uniform documentation of transactions in international trade. See U.S. Int'l Trade Comm'n, Conversion of the Tariff Schedules of the United States Annotated into the Nomenclature Structure of the Harmonized System: Report on Investigation No. 332-131 Under Section 332 of the Tariff Act of 1930, at 15 ("Conversion Report"). The HS is a detailed system, providing for

---

equal protection analysis. . . . [A] higher duty on gloves imported for men is a discriminatory duty on men for purposes of equal protection.").

thousands of different tariff classifications, and contains many subdivisions created in order to reflect changes in technology, trade patterns, and user requirements. Id. The adoption by the United States of such a comprehensive classification system was the result of extensive multilateral international negotiations and considerable domestic study and comment. See 19 U.S.C. § 3001 et seq. See generally Conversion Report. The rates of duty applicable to different product classifications are the result of multilateral international trade negotiations and reflect reciprocal trade concessions and particularized trade preferences.[7] The reasons behind different duty rates vary widely based on country of origin, the type of product, the circumstances under which the product is imported, and the state of the domestic manufacturing industry. Under such circumstances it is quite possible, even likely, that the different tariff rates for men's and other gloves reflect the fact that such gloves are in fact different products, manufactured by different entities in different countries with differing impacts on domestic industry. Further, differential rates may be the result of trade concessions made by the United States in return for unrelated trade advantages.[8] Absent a showing that Congress intended to discriminate against men in the tariff schedule, we cannot simply assume the existence of such an unusual purpose from the mere fact of disparate impact.

---

[7] See Def.-Appellee's Br. 24 ("The challenged rates reflected in the HTSUS are the result of a complex series of multilateral negotiations with the GATT participants. In prepping for the negotiations, the President . . . developed the United States negotiating positions through input from a wide variety of governmental, public, and private sources . . . .").

[8] Congress and the President collaborated in the Uruguay Round to negotiate tariff commitments with well over one hundred other "contracting parties" under the General Agreement on Tariffs and Trade (GATT), Oct. 30, 1947, 61 Stat, A5, 55 U.N.T.S. 187.

Second, even if we were to regard the HTSUS schedule as simply designed to raise revenue, we again cannot assume that this differential treatment of different goods is invidious. It is well established that the federal government and the states have broad leeway in establishing classifications for purposes of taxation. The Supreme Court has long held that "[i]nherent in the power to tax is the power to discriminate in taxation. 'Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes.'" Leathers v. Medlock, 499 U.S. 439, 451 (1991) (quoting Regan v. Taxation with Representation of Wash., 461 U.S. 540, 547 (1983)) (citing Madden v. Kentucky, 309 U.S. 83, 87-88 (1940); N.Y. Rapid Transit Corp. v. City of New York, 303 U.S. 573, 578 (1938); Magoun v. Ill. Trust & Sav. Bank, 170 U.S. 283, 294 (1898)). The same is necessarily true with respect to the closely-related area of customs duties.[9]

Thus, although disparate impact can be relevant to the determination of a purpose to discriminate, we think that in the area of taxation and tariffs, something more than disparate impact is required to establish a purpose to discriminate for the purposes of pleading an equal protection violation. As the Supreme Court noted in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 41 (1973), "[n]o scheme of taxation, whether the tax is imposed on property, income, or purchases of goods and services, has yet been devised which is free of all discriminatory impact." A contrary ruling would call into question all taxes on items which are disproportionately consumed

---

[9] See Bd. of Trs. of Univ. of Ill. v. United States, 289 U.S. 48, 57 (1933) ("The Congress may determine what articles may be imported into this country and the terms upon which importation is permitted. No one can be said to have a vested right to carry on foreign commerce with the United States. If the Congress saw fit to lay an embargo or to prohibit altogether the importation of specified articles, . . . the Congress may . . . ." (citations omitted)).

by any identifiable group. We note that the Supreme Court even in the First Amendment context has held that distinctions in taxation between media (newspapers and cable systems) are in and of themselves insufficient to establish a purpose to discriminate between the two based on content. Leathers, 499 U.S. at 453. So here the mere existence of disparate impact does not establish impermissible discrimination. In the area of customs duties, even more than in the area of taxation, it is hazardous to infer discriminatory purpose from discriminatory impact.

Totes cites Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 270 (1993), for the proposition that "an intent to disfavor a certain class can be inferred if taxes target objects favored by a particular class of people." Pl.-Appellant's Br. 51. Bray, however, offers no support for Totes' position. In Bray, the Supreme Court, in discussing whether the goal of preventing abortion qualifies as an invidiously discriminatory animus directed at women in general, remarked that "[s]ome activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed. A tax on wearing yarmulkes is a tax on Jews." 506 U.S. at 270. Men's gloves are hardly an irrational object of disfavor, and a tax on them creates no compelling inference that Congress intended to discriminate against men.

For the above reasons, we hold that because the challenged provisions of the HTSUS are not facially discriminatory, Totes is required to allege facts sufficient to establish a governmental purpose to discriminate between male and female users. Here, an allegation of mere disparate impact is not sufficient to satisfy this pleading

requirement.  Because Totes does not meet its burden to allege facts sufficient to infer a governmental purpose to discriminate, we hold that Totes' complaint fails to state an equal protection claim.  The same necessarily is true with respect to Totes' allegation of discrimination based on age, which is subject only to rational basis review.

## CONCLUSION

We affirm the Court of International Trade's judgment concluding that it had jurisdiction under section 1581(i), that Totes has standing to bring its claims, and that Totes' equal protection claims are justiciable.  We also affirm its judgment that Totes has failed to state an equal protection claim due to its failure to plead facts sufficient to allege a claim of unconstitutional discrimination.

## AFFIRMED

## COSTS

No costs.

# United States Court of Appeals for the Federal Circuit

2009-1113

TOTES-ISOTONER CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of International Trade in case no. 07-00001, Chief Judge Jane A. Restani, Judge Donald C. Pogue, and Judge Judith M. Barzilay.

PROST, <u>Circuit Judge</u>, concurring in the result.

While I concur with the result in this case, I do not accept the majority's treatment of trade law as an exception to this country's equal protection jurisprudence and implication that a heightened legal standard applies only in the context of tariff schedules. I find the majority's position on this issue particularly difficult because it was never advocated by the Government, and is not responsive to Totes-Isotoner Corporation's ("Totes's") arguments on appeal. The present case can be readily dismissed under current Supreme Court precedent because the disputed tariff classification is not facially discriminatory.

Totes's complaint states, "the rate of duty imposed on seamed leather gloves imported for men is higher than the rate of seamed leather gloves imported for women, and there is no exceedingly persuasive justification for this discrimination. Defendant has thereby discriminated against [Totes] . . . ." A similar allegation is made for age discrimination based on the distinction between men's and children's gloves.

The case, in my view, is properly dismissed under current controlling equal protection and pleading law. The fact that the tariff scheme is designed to protect domestic industry and harmonize international markets is not a reason to create an exception to discrimination law, but rather, it provides the very persuasive justification under the law that Totes alleges is lacking. The Government's brief correctly characterizes the objectives of tariff laws as justifying the disputed classification, rather than necessitating an exception to traditional equal protection analysis.

Stating an equal protection claim requires alleging either (a) that a law is facially discriminatory against natural persons, or (b) that the law has a disparate impact on natural persons resulting from a discriminatory purpose. Raytheon v. Hernandez, 540 U.S. 44, 52-53 (2003); Vill. of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 264-65 (1977). Although the majority opinion focuses on dismissing a claim of disparate impact, Totes's brief to this court focuses entirely on whether the tariff classification is facially discriminatory.

The majority opinion declares that imposing the disputed tariff results in a disparate impact on adult male glove wearers. The opinion then goes on to hold that in the unique context of tariff law, showing disparate impact is never enough, and the complainant must allege additional facts demonstrating a discriminatory purpose. Such a position is unnecessary, however, because Totes does not argue on appeal that the tariff results in a disparate impact, and the complaint does not allege any disparate

impact.[1]

In my view, the more straightforward answer to Totes's arguments on appeal is that the tariff classification here is not facially discriminatory. It imposes a burden on importers, not gender- or age-based classes of people.[2] It distinguishes on the basis of products, not natural people. Cf. Berkley v. United States, 287 F.3d 1076, 1084 (Fed. Cir. 2002) (holding that a law is facially discriminatory if it classifies persons for unequal treatment on the basis of race or gender). The fact that the products are designed for use by men rather than women and children does not constitute disparate treatment of actual men. Much like tuxedos and evening gowns are different products, men's and women's gloves are different products. The happenstance that the English language does not have separate names for these particular products, thus requiring reference to the gender of the intended wearer, does not transform the distinction into facial discrimination.

Bridging the analytical gap between classifying clothing by reference to the gender or age of the intended wearer and engaging in prohibited discrimination thus

---

[1] The majority's analysis with respect to standing is similarly flawed. The majority finds that Totes has standing as a third party on behalf of the men against whom the tariff discriminates. Totes did not allege, however, that the male consumers for whom its gloves were imported are the target of discrimination. Totes alleges that the Government has discriminated against Totes. Totes identifies the harm caused as the higher tariff rate for Totes, and not any harm that may or may not be passed on to consumers. Totes's complaint thus does not state a claim for which third party standing is necessary or appropriate.

[2] Totes cites Church of Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520 (1993), for the proposition that whether a statute is facially discriminatory turns on the object or purpose of the statute. Lukumi, however, actually cuts against Totes's position. Totes failed to allege a discriminatory purpose of the tariff classification. Here, the undisputed object of the statute is to protect domestic industry and harmonize international markets, rather than to infringe upon or restrict men's access to gloves.

requires factual allegations sufficient to establish that imposition of the tariff results in a greater burden to one gender or age group over another. Such allegations would speak to the disparate impact test, rather than the facially discriminatory test.[3]

Totes's complaint alleges discrimination against Totes, not against men. The complaint makes no connection between the impact of the tariff on importers and the impact on consumers. Totes does not allege, for example, that the tariff results in men paying higher prices for gloves, having a more limited selection of colors and styles of gloves, or having a more limited selection of merchants for gloves than women and children. In fact, Totes confirmed at oral argument before this court that it does not allege that the cost of the higher tariff is passed on to consumers. See Oral Argument available at http://oralarguments.cafc.uscourts.gov/mp3/2009-1113.mp3.

Because the tariff classification is not facially discriminatory and Totes has not alleged a disparate impact, Totes has failed to state an equal protection claim on which relief can be granted. I would resolve this case on that basis, rather than on the novel disparate impact analysis of the majority, and thus concur only in the result.

---

[3] Any claim of disparate impact in the present case, however, would also fail under the Supreme Court's test in Arlington Heights, because Totes has not alleged sufficient facts to connect any disparate impact to a discriminatory purpose underlying the classification. This case thus provides no reason to treat tax and tariff law any differently than any other area of law for purposes of inferring discriminatory purpose from a showing of disparate impact.