# United States Court of Appeals for the Federal Circuit

---

**RACK ROOM SHOES,**
*Plaintiff-Appellant,*

AND

**SKIZ IMPORTS LLC,**
*Plaintiff-Appellant,*

AND

**FOREVER 21, INC.,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2012-1391, -1392, -1439

---

Appeals from the United States Court of International Trade in No. 07-CV-0404, Chief Judge Donald C. Pogue.

---

Decided: June 12, 2013

---

JOHN M. PETERSON, Neville Peterson, LLP, of New York, New York, argued for plaintiff-appellant, Rack

Room Shoes. With him on the brief were GEORGE W. THOMPSON, RUSSELL A. SEMMEL and RICHARD F. O'NEILL.

DAMON V. PIKE, The Pike Law Firm, P.C., of Decatur, Georgia, argued for plaintiff appellant, Forever 21, Inc. and MICHAEL T. CONE, FisherBroyles, LLP, of New York, New York, argued for plaintiff appellant, Skiz Imports LLC.

JEANNE E. DAVIDSON, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were STUART F. DELERY, Principal Deputy Assistant Attorney General, REGINALD T. BLADES, JR., Assistant Director, BARBARA S. WILLIAMS, Attorney in Charge, International Trade Field Office, and AIMEE LEE, Senior Trial Counsel. Of counsel on the brief were YELENA SLEPAK, Attorney, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs and Border Protection, of New York, New York and LEIGH BACON, Attorney, Office of the General Counsel, United States Trade Representative, of Washington, DC.

––––––––––––

Before MOORE, CLEVENGER, and REYNA, *Circuit Judges.*

REYNA, *Circuit Judge.*

In this case, we once again are faced with the question of what facts an importer must plead to state a claim that a tariff rate in the Harmonized Tariff Schedule of the United States ("HTSUS") violates equal protection. Importers Rack Room Shoes ("Rack Room"), Skiz Imports LLC ("Skiz"), and Forever 21, Inc. ("Forever 21") (collectively, "Importers") brought suit in the Court of International Trade ("Trade Court") alleging that various classifications in the HTSUS discriminated on the basis of age or gender in violation of the equal protection compo-

nent of the Due Process Clause of the Fifth Amendment. The Trade Court dismissed these complaints for failure to state a claim. For the reasons that follow, we dismiss Skiz's complaint for lack of standing and we affirm the Trade Court's dismissal of Rack Room's and Forever 21's complaints for failure to state a claim.

## BACKGROUND

This case has its genesis in *Totes-Isotoner Corp. v. United States*, 594 F.3d 1346 (Fed. Cir. 2010), and it is there that we begin. In *Totes*, an importer challenged a tariff classification on men's gloves. The *Totes* complaint alleged that the HTSUS assigned a rate of 14% ad valorem to men's gloves and 12.6% ad valorem for all other gloves, including women's and children's gloves. Complaint ¶¶ 9-11, *Totes-Isotoner Corp. v. United States*, 569 F. Supp. 2d 1315 (Ct. Int'l Trade 2008) (No. 1:07-CV-00001), ECF No. 4 ("*Totes Complaint*"). Count I of the complaint alleged a claim of gender discrimination under the equal protection component of the Due Process Clause of the Fifth Amendment, stating that there was no exceedingly persuasive justification for assessing a higher tariff rate for men than for women. *Id.* ¶¶ 15-16. Count II alleged a similar claim for age discrimination, stating that there was no rational basis for charging a higher rate for men's gloves than for children's gloves. *Id.* ¶¶ 18-19.

The Trade Court dismissed the *Totes* complaint for failure to state a claim, and this court affirmed. *See Totes*, 594 F.3d at 1349. In so doing, we held that "because the challenged provisions of the HTSUS are not facially discriminatory, Totes [was] required to allege facts sufficient to establish a governmental purpose to discriminate." *Id.* at 1358. We recognized that the *Totes* complaint alleged that men had been disparately impacted, but observed that "[i]t is well established that disparate impact standing alone does not establish a violation of equal protection." *Id.* at 1356. In particular, the com-

plaint needed "to allege facts sufficient to establish a governmental purpose to discriminate between male and female users." *Id.* at 1358.

After certiorari was denied in *Totes*, the Trade Court allowed other importers, whose complaints had been suspended pending the outcome in *Totes*, to amend their claims to assert disparate impact and purposeful discrimination. Rack Room, Skiz, and Forever 21 each added additional allegations to their complaints in an effort to show discriminatory purpose.

In its complaint, Rack Room alleges that it imports footwear that is classified into various subheadings of HTSUS headings 6403 and 6406. Like the classifications at issue in *Totes*, the subheadings for these categories break down into footwear for "men, youth, and boys" and footwear for "other persons." For six of these subheadings, men's footwear is assessed at a rate of 1.5% less than women's footwear. For one subheading, women's footwear is assessed at a rate of 1.5% less then men's. In a final subheading, women's footwear is assessed at a rate of 4.3% more than men's. Based on these tariffs, Rack Room argues that the HTSUS discriminates on the basis of gender, charging higher tariffs to women's entries, and on age, charging higher tariffs to other persons (which includes only adult women) than to youths (which includes girls).

Rack Room's complaint is more detailed than the *Totes* complaint. For example, Rack Room specifically alleged that "[f]ootwear for men are generally worn by men; footwear for women are generally worn by women," and that the resulting higher duty assessments based on gender or age burdened importers, sellers, and purchasers of the goods. In a section entitled "Congressional Intent," Rack Room asserts that the HTSUS "allows for the differentiation of goods on the basis of standards that do not involve protected classes of persons, such as differentia-

tion of goods based on differences in composition of materials, weight of materials, size of the article, or function of the article." It claims that "Congress intended to discriminate by directing and implementing classifications based on gender when it could have used other non-gender factors to distinguish or to separate merchandise for duty assessment purposes . . . ." Complaint ¶ 31, *Rack Room Shoes v. United States*, 821 F. Supp. 2d 1341 (Ct. Int'l Trade 2012) (No. 1:07-CV-404), ECF No. 2 ("*Rack Room Complaint*").

Forever 21 is an importer and retailer of men's and women's apparel and footwear. It imported and paid duties on goods classified in several dozen HTSUS headings. Roughly half of these classifications assess higher rates on men's goods; the remaining classifications assess higher rates on women's goods. Forever 21 alleged that "[u]pon information and belief, the additional duties on merchandise imported for men or women, as the case may be, are imposed by the government with the intention and result that the people primarily wearing such merchandise are discriminatorily burdened because of their gender." Forever 21 made a similar representation "upon information and belief" regarding classifications that discriminated based on age. In addition, Forever 21 attached two pages from the explanatory notes to the Tariff Classification Study (1960) ("TCS") observing that the economic justification of age- and gender-based classifications of McKay-sewed leather footwear was questionable.

Skiz was incorporated for the purpose of mounting an equal protection challenge against the HTSUS. Skiz imported and paid duties on gloves, apparel and footwear falling within several classifications. It did not, however, sell these goods to customers. In its complaint, Skiz used the same "information and belief" language employed by Forever 21 and cited the same two pages of the TCS.

The Trade Court consolidated the Skiz and Forever 21 cases into the instant case. Consolidation, Test Case Designation & Scheduling Order at 1, *Rack Room*, 821 F. Supp. 2d 1341 (No. 1:07-404). In the same order, it stayed 124 additional suits resting on the same legal basis, as well as "all subsequently filed cases that challenge the constitutionality of Customs' assessment of different duty rates on same or similar products based on age or gender."[1] *See id.* at 2, 4-7. The Trade Court then granted the government's motion to dismiss for failure to state a claim and denied the subsequent motion for reconsideration. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## DISCUSSION

Rack Room argues that the Trade Court erred in concluding that Rack Room failed to allege facts sufficient to state a claim because the HTSUS is facially discriminatory and because Congress's failure to choose non-discriminatory alternatives is evidence of discriminatory intent. Forever 21 and Skiz argue that the Trade Court erred in concluding that certain historical evidence relied upon by both parties did not give rise to a plausible inference of discriminatory intent.

The government responds that the HTSUS is not facially discriminatory, that Importers have not adequately pleaded disparate impact, and that Importers have not shown that the HTSUS does not withstand rational basis scrutiny. The government also argues that Importers are without standing to challenge the HTSUS.

---

[1] After oral argument in this case, the government submitted a letter under Fed. R. App. P. 28(j) in which it represented that 47 new cases have been filed. Including the original 124, there are now 171 pending cases awaiting the outcome of this appeal.

"We apply a de novo standard of review to . . . a trial court's dismissal for failure to state a claim for which relief can be granted." *Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 672 F.3d 1041, 1049 (Fed. Cir. 2012), *cert. denied*, 133 S. Ct. 126 (2012). Standing is a question of law which we review de novo. *Totes*, 594 F.3d at 1350.

I

We begin with the government's argument that Importers lack third party standing. Importers each respond that this case is identical to *Totes*, in which this court found that third party standing was proper because the importers' standing was "by its nature, derivative." *Totes*, 594 F.3d at 1352 n.2. Skiz additionally contends that it has third party standing "even though it does not sell its imported merchandise."

We explained the requirements for third party standing in *Totes*: "A third party . . . can claim *jus tertii* standing only when (1) the *jus tertii* plaintiff and the party whose rights it is asserting have a close relationship; (2) the *jus tertii* plaintiff has suffered an injury in fact; and (3) there is some hindrance to the first party filing its own claim." 594 F.3d at 1352 (citing *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991)). Applying these factors to almost identical facts, we noted that "[t]here is a close relationship between importers and purchasers" and that the requirement to pay higher tariffs injured the importers. *Id.* Additionally, we observed that "purchasers have no remedy to challenge the tariff classification." *Id.* Accordingly, we concluded that the importers in *Totes* had third party standing.

With respect to Rack Room and Forever 21, the facts are indistinguishable from those in *Totes*, and we conclude that those parties have third party standing here. But the facts are different with respect to Skiz. Skiz was incorporated for the purpose of setting up a test case. It imported and paid duties on goods, but it has never sold

those goods to consumers.  We therefore cannot say that Skiz has a close relationship, or indeed any relationship, with a third party consumer whose rights it can now assert.  *See Kowalski v. Tesmer*, 543 U.S. 125, 130-31 (2004) (holding that attorneys lacked third party standing to assert the rights of future, as yet unascertained clients with whom "they ha[d] no relationship at all").

Skiz also contends that it has "first party standing to bring [its] equal protection claims."[2]  "[A]t an irreducible minimum, Art. III requires a party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putative illegal conduct of the defendant . . . and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision."  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982).  With respect to the first element, actual injury, "the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted) (internal quotation marks omitted).  The burden of establishing these elements falls upon the party invoking federal jurisdiction.  *Id.* at 561.

Here, with respect to its age and gender discrimination claims, Skiz has failed to allege that it has suffered a concrete injury.  Skiz contends that the payment of customs duties itself constitutes an injury in fact.  But Skiz does not have a legally protected interest in not paying tariffs.  Of course, Skiz has a legally protected interest in

---

[2]    On appeal, the issue of first party standing was first raised by Skiz in its reply brief.  In order to fully consider this issue, the panel requested and received additional briefing from both Skiz and the government.

not being treated differently than other, similarly situated importers on the basis of its age or gender, but that is not what happened in this case. Finally, to the extent that Skiz argues that the HTSUS discriminates by assessing different rates on items of property within the same class of goods, Skiz has waived this argument by failing to make it in its appeal. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006). Ultimately, Skiz's complaint depends entirely on the rights of third parties who, by virtue of Skiz's decision not to sell the imported goods, simply do not exist.

## II

Rack Room and Forever 21 each argue that the Trade Court erred in dismissing their complaint for failure to state a claim. To state a claim, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 does not require "detailed factual allegations," but demands more than a "naked assertion": "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"In reviewing a motion to dismiss based on the pleadings, this court must accept all well-pleaded facts as true and view them in the light most favorable to the non-moving party." *United States v. Ford Motor Co.*, 497 F.3d 1331, 1336 (Fed. Cir. 2007). This rule does not apply, however, to legal conclusions. *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Accordingly,

> a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal con-

clusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.*

Where, as here, a law is facially neutral, a party pleading discrimination under equal protection must show that the law has a disparate impact on natural persons resulting from a discriminatory purpose. *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-65 (1977). Disparate impact, standing alone, does not establish a violation of equal protection. *Totes*, 594 F.3d at 1356. "Proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights*, 429 U.S. at 265. Discriminatory intent implies more than mere awareness of consequences—it implies that Congress enacted the contested classifications of the HTSUS "because of, not merely in spite of, [their] adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (internal quotation marks omitted).

## A

With this background in mind, we turn to whether Rack Room has pleaded sufficient facts to raise a plausible claim that the government, in enacting the HTSUS, has purposely discriminated. Rack Room argues that "[t]he Supreme Court's Commerce Clause jurisprudence aptly shows that a legislature's disregard for legitimate, available alternatives that avoid disparately impacting a protected class is circumstantial evidence that . . . can satisfy the requirement that a plaintiff plead invidious discriminatory intent." Essentially, Rack Room asks us to infer from the availability of nondiscriminatory alternatives the discriminatory intent necessary plead an equal

protection violation. We decline to do so because the Commerce Clause embodies a different standard than the standard for evaluating the equal protection challenge in this case.

Under the Dormant Commerce Clause, a law will be found discriminatory either if it facially discriminates against out-of-staters or if it is facially neutral and is deemed to have a discriminatory purpose or impact. *See Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979). When discrimination is demonstrated, the burden falls on the government to show that the statute "'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (quoting *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 101 (1994)); *see also Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 353 (1977).

The standard is different in equal protection cases. "[E]ven if a neutral law has a disproportionately adverse effect upon a [protected class], it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose." *Feeney*, 442 U.S. at 272.

The additional pleadings in Rack Room's complaint do not state a plausible claim that the unequal tariffs Rack Room complains of are the result of a discriminatory purpose. Rather, they present a legal argument that Rack Room need not show a discriminatory purpose because nondiscriminatory alternatives are available. This argument confuses the government's defense under the Dormant Commerce Clause with a claimant's burden under equal protection. Permitting an inference of discriminatory intent merely on the basis of the government's decision to forgo an alternative that does not mention age or gender would eviscerate the requirement that claimants must plead intent to state an equal protec-

tion claim. We therefore decline Rack Room's request that we apply the Commerce Clause standard to its equal protection claims.

## B

Rack Room's second argument is that the Trade Court either failed to address or incorrectly addressed its argument that the HTSUS classifications it challenged were facially discriminatory. In essence, Rack Room's argument is that since *Totes* dealt with a different section of the HTSUS, the court could not rely on it or its reasoning in determining that similar HTSUS classifications do not discriminate on their face.

Although the *Totes* majority states that "the challenged provisions of the HTSUS are not facially discriminatory," 594 F.3d at 1358, its reasoning for this statement is not perfectly clear. The court appears to have taken the view that the HTSUS did not discriminate against users based on their gender, but instead discriminated between products based on the intended gender of their users. *See id.* at 1355. In her concurrence, Judge Prost addressed the issue directly, stating that the HTSUS "distinguishes on the basis of products, not natural people." *Id.* at 1359 (Prost, J., concurring).

With respect to whether the HTSUS provisions are facially discriminatory, we see no conflict between the majority opinion and the concurrence in *Totes*. As Judge Prost correctly observed, "[t]he happenstance that the English language does not have separate names for these particular products, thus requiring reference to the gender of the intended wearer, does not transform the distinction into facial discrimination." *Id.* at 1360. Instead, as the majority noted, the HTSUS is "designed to promote particular trade policy objectives negotiated with other countries." *Id.* at 1356. Its rates are "the result of multilateral international trade negotiations and reflect reciprocal trade concessions and particularized trade

preferences." *Id.* at 1357. Classifications based on the intended gender of a product's users "likely . . . reflect the fact that such [items] are in fact different products, manufactured by different entities in different countries with differing impacts on domestic industry [, and] may be the result of trade concessions made by the United States in return for unrelated trade advantages." *Id.* Because neither the majority nor the concurrence found the HTSUS to be facially discriminatory, both concluded that equal protection claims against HTSUS classifications were required to satisfy the disparate impact test, including pleading facts to plausibly show that Congress acted with the intention of discriminating.

As to Rack Room's argument that the Trade Court failed to make a determination that the contested headings were not facially discriminatory, we do not agree. The Trade Court specifically addressed this argument when it denied Rack Room's motion for reconsideration. It examined the language of 157 challenged headings and concluded that none were significantly different from the heading that was held to be facially neutral in *Totes*. We have reviewed these headings and can find no error in the Trade Court's decision.

## C

We turn next to Forever 21. Forever 21 points to three allegations it claims meet its pleading obligations under *Totes*. First, it argues that it amended its complaint to allege that the classified merchandise is of the same class. Although this is, as *Totes* discussed, necessary in order to establish an equal protection claim, it alone is not sufficient. In particular, the fact that merchandise is in the same class says nothing about whether a plausible inference exists that the classifications were adopted with discriminatory intent.

Second, Forever 21 attached to its complaint an excerpt from the TCS discussing McKay-sewn leather

footwear. It is unclear how the TCS bears on the current HTSUS, if at all. Even assuming that it is proper legislative history of the headings at issue in Forever 21's complaint, the study reveals only that its author considered age and gender classifications to be questionable in McKay-sewn leather footwear. It says nothing to suggest that such classifications were made with discriminatory intent. It also says nothing about categories other than McKay-sewed leather footwear. Nor is it clear that, as in *Nissho Iwai Am. Corp. v. United States*, 143 F.3d 1470, 1473 (Fed. Cir. 1998), this part of the TCS interpreted a term used in the Tariff Schedules of the United States ("TSUS")[3] that carried over into the HTSUS. *See JVC Co. of Am., Div. of US JVC Corp. v. United States*, 234 F.3d 1348, 1355 (Fed. Cir. 2000) (discussing the significant number and nature of changes between the TSUS and the HTSUS). Forever 21 has pleaded no additional facts which would render those inferences plausible.

Forever 21's third and final argument is that its introduction of a portion of an 1892 treatise[4] supports an inference that the tariffs here were adopted with discriminatory intent. According to Forever 21, the treatise discusses how slave states influenced tariffs on cheap wool goods in 1824, obtaining lower tariffs to reduce their expenses on clothing for slaves. We fail to see how the discussion of slavery-related tariffs on wool clothing in this treatise, if it were of record, makes plausible the inference that in enacting the HTSUS some 150 years

---

[3]    The TSUS was the predecessor to the HTSUS. *See Nissho Iwai*, 143 F.3d at 1473. The HTSUS became effective and replaced the TSUS on January 1, 1989. *Marubeni Am. Corp. v. United States*, 35 F.3d 530, 532 (Fed. Cir. 1994).

[4]    This treatise appears in neither the complaint nor the joint appendix.

later, Congress was motivated to discriminate on the basis of age or gender.

## CONCLUSION

Neither Rack Room nor Forever 21 has pleaded facts sufficient to make plausible their claim that Congress enacted the relevant provisions of the HTSUS with discriminatory intent, and we therefore affirm the dismissal of their claims. Skiz's appeal is dismissed for lack of standing.

**AFFIRMED-IN-PART AND DISMISSED-IN-PART**

## COSTS

Each party shall bear its own costs.