# United States Court of Appeals
# for the Federal Circuit

---

**FAIRHOLME FUNDS, INC., ACADIA INSURANCE COMPANY, ADMIRAL INDEMNITY COMPANY, ADMIRAL INSURANCE COMPANY, BERKLEY INSURANCE COMPANY, BERKLEY REGIONAL INSURANCE COMPANY, CAROLINA CASUALTY INSURANCE COMPANY, CONTINENTAL WESTERN INSURANCE COMPANY, MIDWEST EMPLOYERS CASUALTY INSURANCE COMPANY, NAUTILUS INSURANCE COMPANY, PREFERRED EMPLOYERS INSURANCE COMPANY, FAIRHOLME FUND, ANDREW T. BARRETT,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Cross-Appellant*

---

2020-1912, 2020-1914

---

Appeals from the United States Court of Federal Claims in No. 1:13-cv-00465-MMS, Senior Judge Margaret M. Sweeney.

-------------------------------------------------

**OWL CREEK ASIA I, L.P., OWL CREEK ASIA II, L.P., OWL CREEK I, L.P., OWL CREEK II, L.P., OWL CREEK ASIA MASTER FUND, LTD., OWL CREEK CREDIT OPPORTUNITIES MASTER FUND, L.P.,**

**OWL CREEK OVERSEAS MASTER FUND, LTD.,
OWL CREEK SRI MASTER FUND, LTD.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

————————————

2020-1934

————————————

Appeal from the United States Court of Federal Claims in No. 1:18-cv-00281-MMS, Senior Judge Margaret M. Sweeney.

--------------------------------------------------

**MASON CAPITAL L.P., MASON CAPITAL MASTER FUND L.P.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

————————————

2020-1936

————————————

Appeal from the United States Court of Federal Claims in No. 1:18-cv-00529-MMS, Senior Judge Margaret M. Sweeney.

--------------------------------------------------

**AKANTHOS OPPORTUNITY FUND, L.P.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

————————————

2020-1938

————————————

Appeal from the United States Court of Federal Claims in No. 1:18-cv-00369-MMS, Senior Judge Margaret M. Sweeney.

-------------------------------------------------

**APPALOOSA INVESTMENT LIMITED PARTNERSHIP I, PALOMINO MASTER LTD., AZTECA PARTNERS LLC, PALOMINO FUND LTD.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

————————————

2020-1954

————————————

Appeal from the United States Court of Federal Claims in No. 1:18-cv-00370-MMS, Senior Judge Margaret M. Sweeney.

-------------------------------------------------

**CSS, LLC,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

———————————

2020-1955

———————————

Appeal from the United States Court of Federal Claims in No. 1:18-cv-00371-MMS, Senior Judge Margaret M. Sweeney.

-------------------------------------------------

**ARROWOOD INDEMNITY COMPANY, ARROWOOD SURPLUS LINES INSURANCE COMPANY, FINANCIAL STRUCTURES LIMITED,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

———————————

2020-2020

———————————

Appeal from the United States Court of Federal Claims in No. 1:13-cv-00698-MMS, Senior Judge Margaret M. Sweeney.

-------------------------------------------------

**JOSEPH CACCIAPALLE,**
*Plaintiff-Appellant*

**MELVIN BAREISS, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, BRYNDON FISHER, BRUCE REID, ERICK SHIPMON, AMERICAN EUROPEAN INSURANCE COMPANY, FRANCIS J. DENNIS,**
*Plaintiffs*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

————————————

2020-2037

————————————

Appeal from the United States Court of Federal Claims in No. 1:13-cv-00466-MMS, Senior Judge Margaret M. Sweeney.

————————————

Decided:  February 22, 2022

————————————

BRIAN W. BARNES, Cooper & Kirk, PLLC, Washington, DC, argued for plaintiff-appellants Fairholme Funds, Inc., Acadia Insurance Company, Admiral Indemnity Company, Admiral Insurance Company, Berkley Insurance Company, Berkley Regional Insurance Company, Carolina Casualty Insurance Company, Continental Western Insurance Company, Midwest Employers Casualty Insurance Company, Nautilus Insurance Company, Preferred Employers Insurance Company, Fairholme Fund, Andrew T. Barrett. Also represented by VINCENT J. COLATRIANO, CHARLES J.

COOPER, PETER A. PATTERSON, DAVID THOMPSON.

BRUCE BENNETT, Jones Day, Los Angeles, CA, argued for plaintiffs-appellants Owl Creek Asia I, L.P., Owl Creek Asia II, L.P., Owl Creek I, L.P., Owl Creek II, L.P., Owl Creek Asia Master Fund, Ltd., Owl Creek Credit Opportunities Master Fund, L.P., Owl Creek Overseas Master Fund, Ltd., Owl Creek SRI Master Fund, Ltd., Mason Capital L.P., Mason Capital Master Fund LP, Akanthos Opportunity Fund, L.P., Appaloosa Investment Limited Partnership I, Palomino Master Ltd., Azteca Partners LLC, Palomino Fund Ltd., CSS, LLC. Also argued by LAWRENCE D. ROSENBERG, Washington, DC. Also represented by C. KEVIN MARSHALL.

DREW WILLIAM MARROCCO, Dentons US LLP, Washington, DC, argued for plaintiffs-appellants Arrowood Indemnity Company, Arrowood Surplus Lines Insurance Company, Financial Structures Limited. Also represented by RICHARD M. ZUCKERMAN, New York, NY.

HAMISH HUME, Boies Schiller & Flexner LLP, Washington, DC, argued for plaintiff-appellant Joseph Cacciapalle.

MARK B. STERN, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, argued for United States. Also represented by BRIAN M. BOYNTON, KYLE T. EDWARDS, GERARD SINZDAK, ABBY CHRISTINE WRIGHT.

NOAH SCHUBERT, Schubert Jonckheer & Kolbe LLP, San Francisco, CA, for amici curiae Bryndon Fisher, Bruce Reid, Erick Shipmon. Also represented by ROBERT SCHUBERT; PATRICK VALLELY, Shapiro Haber & Urmy LLP, Boston, MA.

———————————

Before LOURIE, PROST, and O'MALLEY, *Circuit Judges*.

O'MALLEY, *Circuit Judge.*

Certain shareholders of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) appeal a judgment of the United States Court of Federal Claims (Claims Court) granting-in-part the government's motion to dismiss their directly pled constitutional and non-constitutional claims for either lack of standing or lack of subject matter jurisdiction. *See Fairholme Funds, Inc. v. United States*, 147 Fed. Cl. 1 (2019); *Owl Creek Asia I, L.P. v. United States*, 148 Fed. Cl. 614 (2020); *Mason Cap. L.P. v. United States*, 148 Fed. Cl. 712 (2020); *Akanthos Opportunity Master Fund, L.P. v. United States*, 148 Fed. Cl. 647 (2020); *Appaloosa Inv. Ltd. P'ship I v. United States*, 148 Fed. Cl. 679 (2020); *CSS, LLC v. United States*, 149 Fed. Cl. 363 (2020); *Arrowood Indem. Co. v. United States*, 148 Fed. Cl. 299 (2020); *Cacciapalle v. United States*, 148 Fed. Cl. 745 (2020). The government cross-appeals the portions of the Claims Court's judgment denying its motion to dismiss shareholders' derivative claims. Because we conclude that the Claims Court correctly dismissed shareholders' directly pled claims but erred in not dismissing shareholders' derivatively pled allegations, we affirm-in-part and reverse-in-part.

## I. BACKGROUND

Shareholders[1] own stock in Fannie Mae and Freddie Mac (collectively, the Enterprises). The Enterprises suffered devastating financial losses in 2008 when the national housing market collapsed. In response, Congress enacted the Housing and Economic Recovery Act of 2008

---

[1]    For conciseness, we refer collectively to appellants as "shareholders." When necessary, however, we will call out individual shareholders by their respective names (e.g., Fairholme Funds, Barrett, Cacciapalle, etc.).

(HERA).    HERA created the Federal Housing Finance Agency (FHFA), an independent agency tasked with regulating the Enterprises and (if necessary) stepping in as conservator or receiver.  12 U.S.C. §§ 4511, 4617.  HERA also contains a Succession Clause, which states that the FHFA "shall, as conservator or receiver . . . immediately succeed to [] all rights, titles, powers, and privileges of the [Enterprises], and of any stockholder . . . with respect to the [Enterprises] and the assets of the [Enterprises]."  *Id.* § 4617(b)(2)(A)(i).

With the consent of the Enterprises' boards of directors, the FHFA's Director placed the Enterprises into conservatorship in September 2008.  J.A. 497–98; J.A. 530. The FHFA Director then negotiated preferred stock purchase agreements (PSPAs) with the Department of Treasury (Treasury) in which Treasury agreed to allow the Enterprises to draw up to $100 billion in capital in exchange for: (1) senior preferred non-voting stock having quarterly fixed-rate dividends and an initial liquidation preference of $1 billion and (2) warrants to purchase up to 79.9% of the common stock of each Enterprise at a nominal price.  J.A. 415–18; J.A. 498–99.

FHFA and Treasury amended the terms of the original PSPAs in the years that followed.  Relevant to this appeal, a "net worth sweep" under the PSPAs replaced the fixed-rate dividend formula with a variable one that required the Enterprises to make quarterly payments equal to their entire net worth, minus a small capital reserve amount. J.A. 437; J.A. 506–07.  The net worth sweep caused the Enterprises to transfer most, if not all, of their equity to Treasury, leaving no residual value that could be distributed to shareholders.  J.A. 437; J.A. 506–07.

Shareholders launched a series of challenges to the net worth sweep that have worked their way through several fora, including the D.C. Circuit and the Supreme Court. *See, e.g.*, *Perry Cap. LLC v. Lew*, 70 F. Supp. 3d 208 (D.D.C.

2014) ("*Perry I*"); *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) ("*Perry II*"); *Collins v. Yellen*, 141 S. Ct. 1761 (2021) ("*Collins*"). Parallel to these unsuccessful attempts to undo the net worth sweep, shareholders filed complaints with the Claims Court, alleging the following direct claims: (1) the net worth sweep violated the Fifth Amendment for taking (or, alternatively, illegally exacting) the shareholders' equity in the Enterprises without just compensation; (2) the FHFA breached its fiduciary duties by entering into the net worth sweep; and (3) the FHFA and the Enterprises breached an implied-in-fact contract (with shareholders as the intended third-party beneficiaries) by agreeing to the net worth sweep. *See, e.g.*, *Fairholme*, 147 Fed. Cl. at 22. Barrett, an individual shareholder of the Enterprises, separately asserted derivative claims on behalf of the Enterprises, alleging similar takings, illegal exaction, breach of fiduciary duty, and breach of contract claims. *See id.*

The government moved to dismiss the claims in every case before the Claims Court in a single, omnibus motion. *See id.* at 22 & n.11. The Claims Court first granted-in-part and denied-in-part the government's motion in one case, *Fairholme Funds, Inc. v. United States*. *See id.* at 15. Specifically, the Claims Court dismissed the shareholders' direct Fifth Amendment takings and illegal exaction claims for lack of standing because it found them to be substantively derivative in nature. *See, e.g.*, *id.* at 45. The Claims Court also dismissed for lack of subject matter jurisdiction the shareholders' direct claims for breach of fiduciary duty, *see, e.g.*, *id.* at 37, and breach of implied-in-fact contract, *see, e.g.*, *id.* at 40. The Claims Court, however, found that Barrett had standing to bring his derivative claims, notwithstanding HERA's Succession Clause, under the conflict-of-interest exception espoused in *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed. Cir. 1999). *See Fairholme*, 147 Fed. Cl. at 49.

Having dismissed the direct takings claims in *Fairholme*, the Claims Court solicited supplemental briefing from the parties in the other cases on the applicability of its holding in *Fairholme* to those cases.  *See, e.g.*, *Owl Creek Asia I*, 148 Fed. Cl. at 639.   Following supplemental briefing, the Claims Court dismissed each of the other seven cases on appeal for the reasons explained in *Fairholme*.  *See* J.A. 284–90.  The shareholders appealed in all seven of those cases; we have jurisdiction under 28 U.S.C. § 1295(a)(3).   Because some of Barrett's claims in the *Fairholme* case survived, the Claims Court certified its opinion in that case for interlocutory appeal and cross-appeal by the shareholders and the government, respectively, so that we could consider the matters collectively. *See Fairholme*, 147 Fed. Cl. at 53–54.  We possess jurisdiction over the certified interlocutory appeal and cross-appeal under 28 U.S.C. § 1292(d).   We, thus, are resolving eight appeals in this single opinion; seven from final judgments and one certified interlocutory appeal.[2]

## II. STANDARD OF REVIEW

We review a dismissal for lack of standing de novo.  *See Rack Room Shoes v. United States*, 718 F.3d 1370, 1374

---

[2]    Some appellants chose to consolidate their cases for briefing purposes, but the actual appeals were never consolidated.  We granted the motions of other appellants to consolidate the appeals in *Owl Creek Asia I, L.P. v. United States*, No. 20-1934, *Mason Capital L.P. v. United States*, No. 20-1936, *Akanthos Opportunity Fund, L.P. v. United States*, No. 20-1938, *Appaloosa Investment Ltd. Partnership I v. United States*, No. 20-1954, and *CSS, LLC v. United States*, No. 20-1955.  *See, e.g.*, Order Granting Appellants' Unopposed Mot. to Consolidate at 4, *Owl Creek Asia I, L.P. v. United States*, No. 20-1934 (Fed. Cir. July 15, 2020), ECF No. 6.  As a result, the docket reflects fewer than eight sets of briefing, but that does not alter the number of matters actually resolved.

(Fed. Cir. 2013). We also review grants or denials of motions to dismiss for lack of subject matter jurisdiction de novo. *See Northrop Grumman Computing Sys., Inc. v. United States*, 709 F.3d 1107, 1111 (Fed. Cir. 2013); *see also Maher v. United States*, 314 F.3d 600, 603 (Fed. Cir. 2002).

There were times where the Claims Court predicated its dismissals on Rule of the Court of Federal Claims 12(b)(1) for lack of standing, or otherwise for lack of subject matter jurisdiction, but certain of the claims actually fail, in our view, to state a claim for which relief can be granted under Rule 12(b)(6). We find those procedural errors to be "of no moment" where the conclusion that dismissal under Rule 12 is otherwise warranted. *See Perry II*, 864 F.3d at 623–24 (citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)); *see also Wyandot Nation of Kan. v. United States*, 858 F.3d 1392, 1397 (Fed. Cir. 2017) (noting that we may affirm the Claims Court's dismissal of an action on any grounds supported by the record).

## III. THE SHAREHOLDERS' DIRECT CLAIMS

The shareholders in all of these appeals challenge the Claims Court's dismissal of their direct takings and illegal exaction claims for lack of standing. They also challenge the Claims Court's dismissal of their direct breach of contract claims and breach of fiduciary duty claims for lack of jurisdiction. Cacciapalle separately disputes dismissal of an additional takings claim that only he asserts.[3]

---

[3]    The Claims Court also dismissed Fairholme's takings claim on the alternative ground that Fairholme did not own shares in the Enterprises at the time of the net worth sweep. Because we dismiss Fairholme's direct claims on alternative grounds, we need not address the Claims Court's alternative holding or the parties' arguments relating to it.

The government cross-appeals in all cases, arguing that the Claims Court lacked jurisdiction over all the shareholders' claims because they are not claims against the United States. The government also argues that HERA's Succession Clause bars all of Barrett's derivative claims and that he is estopped from pursuing a derivative breach of contract claim.

We begin with the government's first argument on cross-appeal because that question is determinative of the Claims Court's jurisdiction to consider any of the shareholders' claims. We then address the shareholders' arguments regarding their direct claims before turning to those relating to their derivative claims. We address the government's other arguments on cross-appeal where they most logically fit in this analytical framework.

A. The FHFA, as conservator, is the United States

The Tucker Act grants the Claims Court subject matter jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The shareholders' challenges to the net worth sweep may only proceed, therefore, if they are properly pled as claims "against the United States."

The Supreme Court previously interpreted the Succession Clause of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), which contains nearly identical language to HERA's Succession Clause, to mean that, when a government agency serves as a receiver for an entity, it "steps into the shoes of the failed [institution]." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994) (internal quotation marks omitted). Relying on *O'Melveny*, several circuits have interpreted HERA's Succession Clause to indicate that the FHFA steps into the Enterprises' shoes (and, thus, sheds its governmental character) when acting as the Enterprises' conservator. *See Herron v. Fannie Mae*,

861 F.3d 160, 169 (D.C. Cir. 2017); *see also Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 579 (4th Cir. 2017); *United States ex rel. Adams v. Aurora Loan Servs., Inc.*, 813 F.3d 1259, 1261 (9th Cir. 2016).

Despite these cases, the Claims Court found that the FHFA's adoption of the net worth sweep during its tenure as conservator did not cause the FHFA to shed its governmental character. *See Fairholme*, 147 Fed. Cl. at 34. The Claims Court based its holding on the reasoning in a district court decision: *Sisti v. Federal Housing Finance Agency*, 324 F. Supp. 3d 273 (D.R.I. 2018). *See Fairholme*, 147 Fed. Cl. at 33–34 (citing *Sisti*, 324 F. Supp. 3d at 279). In the *Sisti* court's view, a receiver "step[s] into the shoes of the entity by assuming the fiduciary duties *of* the entity, but the conservator does not: it remains distinct, and rather owes a duty *to* the entity." *Sisti*, 324 F. Supp. 3d at 283 (internal quotation marks omitted) (emphasis in original). After the Claims Court's decision in this case, the First Circuit overruled *Sisti*. *Boss v. Fed. Hous. Fin. Agency*, 998 F.3d 532 (1st Cir. 2021). The First Circuit agreed with its sister circuits and concluded that the receiver versus conservator distinction did not support the district court's conclusion. It found that the FHFA was not a government actor when, pursuant to HERA's Succession Clause, it exercised the Enterprises' private contractual right to nonjudicially foreclose on appellants' mortgages. *Montilla v. Fed. Nat'l Mortg. Ass'n*, 999 F.3d 751, 757 (1st Cir. 2021).

After the Claims Court issued its opinion and the First Circuit overruled *Sisti*, the Supreme Court issued its decision in *Collins*, 141 S. Ct. 1761. *Collins* held that, in the context of a separation-of-powers claim, the FHFA retained its governmental character:

> [E]ven when [the FHFA] acts as conservator or receiver, its authority stems from a special statute, not the laws that generally govern conservators

> and receivers. In deciding what it must do, what it cannot do, and the standards that govern its work, the FHFA must interpret [HERA], and "[i]nterpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law."

*Id.* at 1785–86 (citing *Bowsher v. Synar*, 478 U.S. 714, 733 (1986)). The Supreme Court highlighted the critical differences between the FHFA's powers under HERA and those of most conservators and receivers:

> [The FHFA] can subordinate the best interests of the [Enterprises] to its own best interests and those of the public. *See* 12 U.S.C. § 4617(b)(2)(J)(ii). Its business decisions are protected from judicial review. § 4617(f). It is empowered to issue a "regulation or order" requiring stockholders, directors, and officers to exercise certain functions. § 4617(b)(2)(C). It is authorized to issue subpoenas. § 4617(b)(2)(I). And of course, it has the power to put the [Enterprises] into conservatorship and simultaneously appoint itself as conservator. § 4617(a)(1).

*Id.* For these reasons, the Court held that "the FHFA clearly exercises executive power" when acting as a conservator. *Id.* at 1786.[4]

---

[4] The Supreme Court distinguished *O'Melveny* on grounds that it had interpreted FIRREA, and not HERA. The Supreme Court noted that *O'Melveny* "held that state law, not federal common law, governed an attribute of the FDIC's status as receiver for an insolvent savings bank." *Collins*, 141 S. Ct. at 1786 n.20. In contrast to the FDIC's status under FIRREA, however, the Supreme Court concluded that "[t]he nature of the FDIC's authority in that

The government contends that the Claims Court erred in holding that the FHFA retained its governmental character when it agreed to the net worth sweep in its role as conservator. According to the government, *Collins*'s holding is distinguishable because that case dealt with a separation-of-powers challenge to HERA's restriction on the President's power to remove the FHFA's Director, while these cases deal with the FHFA's adoption of the net worth sweep. For a separation-of-powers analysis, intones the government, courts look to all the functions and powers exercised by the relevant official. By contrast, outside the separation-of-powers context, courts focus on whether the agency's specific actions are governmental in nature or are, instead, commercial activities typically performed by private entities. The government contends that, in agreeing to the net worth sweep, the FHFA exercised a non-governmental power that corporate officers and directors typically wield: the renegotiation of an existing lending agreement. The government analogizes the FHFA to the following non-governmental entities: (1) the Enterprises, which must pursue public policy goals and objectives pursuant to their charter and (2) private actors, which must interpret applicable federal law to determine what they can and cannot do and what standards govern their work.

We are not convinced. As the *Collins* court noted, "[i]n deciding what it must do, what it cannot do, and the standards that govern its work, the FHFA must interpret [HERA], and '[i]nterpreting a law enacted by Congress to implement the legislative mandate is the very essence of execution of the law.'" *Id.* at 1785 (citing *Bowsher*, 478 U.S. at 733) (alterations in original). Here, the FHFA exercised one of its powers under HERA—subordinating the best interests of the Enterprises and its shareholders to its own

_____

capacity sheds no light on the nature of the FHFA's distinctive authority as conservator under [HERA]." *Id.*

best interests and those of the public, 12 U.S.C.
§ 4617(b)(2)(J)(ii)—when it adopted the net worth sweep.
*See Collins*, 141 S. Ct. at 1776–77, 1786. It necessarily in-
terpreted its statutory mandate when reaching the conclu-
sion that it possessed the authority to do so. We therefore
hold that the FHFA's adoption of the net worth sweep is
attributable to the United States.[5]

Contrary to the government's proffered analogies,
moreover, the FHFA is distinguishable from the Enter-
prises and private actors. Notwithstanding the Enter-
prises' "federal governmental objectives," the government
does not control their operations through its appointees as
is the case with the FHFA. *See Am. Bankers Mortg. Corp.
v. Fed. Home Loan Mortg. Corp.*, 75 F.3d 1401, 1406–07
(9th Cir. 1996). Private actors interpreting the law are also
distinguishable from the FHFA because they do not exer-
cise any Congressionally granted powers. The FHFA, for
example, published final regulations in the Federal Regis-
ter reflecting the net worth sweep's prohibition on distribu-
tion of capital while the Enterprises were in
conservatorship. *See* Conservatorship and Receivership,
76 Fed. Reg. 35,724 (June 20, 2011) (codified at 12 C.F.R.
pt. 1229, 1237); *see also* 12 C.F.R. § 1237.12. These regu-
lations cite, *inter alia*, 12 U.S.C. § 4617 as their legislative
source—which details the grant of authority to the FHFA
to impose a conservatorship or receivership, *see* 12 U.S.C.
§ 4617(a)—as well as HERA's Succession Clause, *see* 12
U.S.C. § 4617(b)(2)(A)(i). Thus, unlike private actors

---

[5] The government expresses concern for the
"far-reaching" consequences of holding that the FHFA as
conservator (and other government agencies that serve as
conservators or receivers) is, at all times, the government.
But our holding today is not so broad. We simply hold that,
as to the net worth sweep, the FHFA was acting in an ex-
ecutive capacity.

interpreting the law, the FHFA is different because it expressly wields executive power whenever it does so.

For these reasons, the shareholders' claims are "against the United States" and the Claims Court properly exercised jurisdiction. *See* 28 U.S.C. § 1491(a)(1). We, thus, turn to the merits of shareholders' claims, beginning with their direct constitutional claims.

### B. Shareholders' direct constitutional claims

The Claims Court dismissed shareholders' direct takings and illegal exaction claims for lack of standing, on the grounds that those claims were substantively derivative in nature. *See Fairholme*, 147 Fed. Cl. at 46 ("Because plaintiffs have not established that their 'direct' claims are substantively direct in nature, they cannot demonstrate that they have standing to litigate those claims."). The Claims Court concluded that "[t]he gravamen of each claim is the same: [t]he government, via the [net worth sweep], compelled the Enterprises to overpay Treasury." *Id.* Relying on the Delaware Supreme Court's decision in *Gentile v. Rossette*, 906 A.2d 91 (Del. 2006), which held that claims founded upon allegations of overpayment were substantively derivative, the Claims Court held that "[t]he claims remain derivative because plaintiffs' purported harms are merely the unavoidable result . . . of the reduction in the value of the entire corporate entity." *Fairholme*, 147 Fed. Cl. at 47 (internal quotation marks omitted) (citations omitted) (citing *Protas v. Cavanagh*, No. 6555-VCG, 2012 WL 1580969, at *6 (Del. Ch. May 4, 2012)). The Claims Court rejected shareholders' contentions that their claims qualified as direct under Delaware's then-extant dual nature doctrine, also described in *Gentile*.[6] *Id.* at 45–46.

---

[6] Delaware's dual nature doctrine allowed a substantively derivative shareholder claim to *also* be direct when the following circumstances obtain: "(1) a stockholder

Shareholders jointly argue that the Claims Court erred in finding that their direct constitutional claims are substantively derivative. Because shareholders are pursuing constitutional takings and illegal exaction claims, federal law dictates whether they have standing. *Cf. Starr Int'l Co. v. United States*, 856 F.3d 953, 965 (Fed. Cir. 2017) ("Because Starr presses the Equity Claims under federal law, federal law dictates whether Starr has direct standing.") (citations omitted). According to federal law, only "shareholder[s] with a direct, personal interest in a cause of action," rather than "injuries [that] are entirely derivative of their ownership interests" in a corporation, may bring a direct shareholder action. *Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336–37 (1990).

State law may inform federal law in the corporate law context, however. *See Starr*, 865 F.3d at 966 ("There exists a 'presumption that state law should be incorporated into

---

having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders." *Gentile*, 906 A.2d at 100. During the pendency of this appeal, the Delaware Supreme Court abolished the dual nature doctrine by overruling that aspect of *Gentile* and its progeny. *See Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1267 (Del. 2021) (en banc) (concluding: (1) that the dual nature doctrine is inconsistent with multiple Delaware Supreme Court articulations of the test for when claims are derivative in nature and also unworkable in practice and (2) that claims are derivative in nature whenever the shareholders' claims are not completely independent from the claims of harm to the corporation).

federal common law' unless doing so in a particular context 'would frustrate specific objectives of the federal programs.'") (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991)). We have explained that both federal law and Delaware law distinguish direct and derivative shareholder suits based on the following two factors: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)." *Id.* (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004) (en banc)).[7]

The shareholders rely on a mix of federal and state law principles to urge us to overturn the Claims Court's holding. We address their joint and individual contentions in turn.

### 1. The shareholders' joint arguments

Citing the Delaware Supreme Court's two-part test espoused in *Tooley*, shareholders argue that the Claims Court erred by characterizing the net worth sweep as an overpayment to Treasury that directly harmed the Enterprises by reducing their total assets. Shareholders assert that they satisfy prong one of *Tooley*'s test because the net worth sweep directly harmed them by depriving them of their rights to dividends and related distributions. And, under prong two of *Tooley*, shareholders aver that only a compensatory damages award paid to them would remedy their loss in equity as a result of the net worth sweep. As they did before the Claims Court, shareholders alternatively argue that, even if their claims are derivative, they are also direct under *Gentile*'s dual nature exception

---

[7]   The parties agree that Virginia law, which governs the claims at issue here, mirrors Delaware law on these points.

because the net worth sweep transferred to Treasury, "a dominant shareholder," shareholders' equity.

As explained above, shareholders' arguments based on the dual nature exception to the *Tooley* test are no longer viable; there is no such exception. *See supra*, at 17 n.6. That leaves shareholders' contention that they satisfy the two-part *Tooley* test. They do not.

As the Delaware Supreme Court made clear in *Brookfield Asset Management*, "equity overpayment[] claims, absent more, are exclusively derivative." 261 A.3d at 1267. We have said the same: "claims of corporate overpayment are treated as causing harm solely to the corporation and, thus, are regarded as derivative." *Starr*, 856 F.3d at 967 (quoting *Gentile*, 906 A.2d at 99, *rev'd on other grounds*, *Brookfield*, 261 A.3d 1251). An overpayment occurs whenever the fiduciaries of a corporation cause the entity to "exchange assets at a loss." *In re TerraForm Power, Inc. S'holders Litig.*, No. 2019-0757-SG, 2020 WL 6375859, at \*9 (Del. Ch. Oct. 30, 2020), *rev'd on other grounds*, *Brookfield*, 261 A.3d 1251. Here, shareholders' direct constitutional allegations describe how the net worth sweep resulted in an overpayment: in exchange for FHFA's conservatorship, both the Enterprises and shareholders were forced to pay Treasury at a loss. Fairholme, for example, alleged in its direct Fifth Amendment takings claim:

> At the outset of conservatorship, FHFA's Director confirmed that both the preferred and common shareholders of Fannie and Freddie retained an economic interest in the [Enterprises]. As equity shareholders, that economic interest took the form of a claim on the [Enterprises'] equity that could be paid out in the form of dividends or a liquidation payment. Plaintiffs had both a property interest and a reasonable, investment-backed expectation in the economic interest in the [Enterprises] they held due to their ownership of Common and

> Preferred Stock. *The Net Worth Sweep expropri-*
> *ated this economic interest by assigning the right to*
> *all of Fannie's and Freddie's equity to Treasury.*

J.A. 461 (¶ 169) (emphasis added). Fairholme employed this same language in its directly pled illegal exaction claim. *See* J.A. 466 (¶ 195). The other appellants similarly allege in their direct takings and illegal exaction claims that the government expropriated their economic interest by paying the Treasury the Enterprises' entire net worth. *See, e.g.*, J.A. 526 (¶ 115); J.A. 528 (¶ 119); J.A. 790 (¶ 133); J.A. 792 (¶ 141); J.A. 808 (¶ 13); J.A. 852 (¶ 128); J.A. 855 (¶ 144).

Because shareholders' complaints describe a species of corporate overpayment, they fail both prongs of *Tooley*'s test. As the Delaware Supreme Court noted in the portion of *Gentile* that has not since been overruled, overpayment claims are normally regarded as derivative because:

> [T]he corporation is both the party that suffers the injury (a reduction in its assets or their value) as well as the party to whom the remedy (a restora-tion of the improperly reduced value) would flow. . . . Such claims are not normally regarded as direct, because any dilution in value of the corpora-tion's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction. In the eyes of the law, such equal "injury" to the shares resulting from a corporate overpayment is not viewed as, or equated with, harm to specific share-holders individually.

906 A.2d at 99.

Despite this seemingly clear authority, shareholders claim that several federal cases still require that we clas-sify their claims as sufficiently direct for standing

purposes. They cite to our own decision in *Starr*, to the *Perry II* decision from the D.C. Circuit, and to the Supreme Court's decisions in *Alleghany Corp. v. Breswick & Co.*, 353 U.S. 151 (1957) and *Collins*.[8]

In *Starr*, we considered a claim by shareholders of American International Group (AIG) relating to the government's 2008 loan to AIG in return for, among other things, the issuance of new equity which placed the government in control of 79% of AIG's shares. The AIG shareholders claimed that the government's equity acquisition constituted a taking of their individual shareholder value by dramatically diluting that value. We concluded that the injuries the shareholders alleged with respect to the acquisition of AIG equity were "quintessentially 'dependent on an injury to the corporation'" and were, thus, "exclusively derivative in nature." *Starr*, 856 F.3d at 967 (quoting *Tooley*, 845 A.2d at 1036). That holding would seem to apply equally to the shareholders' claims here. Shareholders

---

[8]    Shareholders also rely on one sentence from a dissent by Justice Felix Frankfurter in *Swanson v. Traer*, 354 U.S. 91 (1957). There, Justice Frankfurter said, with no citation to other authority, that "[i]f a corporation rearranges the relationship of different classes of security holders to the detriment of one class, a stockholder in the disadvantaged class may proceed against the corporation as a defendant to protect his own legal interest." *Swanson*, 354 U.S. at 99. Putting aside the fact that musings in dissents, even from well-respected jurists, create no precedents, the majority only discussed whether federal diversity jurisdiction can be asserted in shareholder derivative claims and refused to consider "whether it is a proper case for assertion by a stockholder of that cause of action . . . ." *Smith v. Sperling*, 354 U.S. 91, 94 (1957) (publishing the majority opinion under this case name and the dissent under the *Swanson* case name).

claim it does just the opposite. They cite to a section of the opinion in which we declined to equate the issuance of new equity with "the 'separate harm' that results from 'an extraction from the public shareholders and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest.'" *Id.* (quoting *Gentile*, 906 A.2d at 100). We said that the latter might constitute a "separate harm" that could give rise to a direct claim. *Id.*

The shareholders claim that, by acknowledging the possible existence of a "separate harm" arising from the redistribution of existing share value, we held, in that precedential decision, that allegations of such harm are actionable as direct claims. We did no such thing. While we acknowledged the possibility of a "separate harm" where shares of existing stock are physically taken away, that discussion related to our consideration of whether the AIG shareholder claims fell into the dual nature exception to the *Tooley* doctrine created by *Gentile*. But, as noted, that exception no longer exists. Indeed, the portion of *Starr* on which the shareholders rely cites to the portions of *Gentile* that were expressly overruled in *Brookfield*. We see nothing in *Starr* that compels the conclusion that shareholders' direct claims are anything but derivative.

Shareholders' reliance on *Perry II* is similarly unhelpful. Shareholders' attempts to parallel their property rights in the Enterprises to the "obviously direct" breach of their contractual rights in *Perry II* are unpersuasive. The fact that shareholders possess a property interest in their shares of the Enterprises does not answer the question of whether they are asserting direct or indirect harm to that property right. Shareholders clearly allege a corporate overpayment by the Enterprises which, in turn, indirectly diluted the value of their shares. As explained above, assertions of corporate overpayment are substantively derivative claims.

Shareholders' reliance on *Alleghany* fares no better. Shareholders claim that *Alleghany* supports their proposition that, whenever rights are shifted from one class of shareholders to another, the disadvantaged shareholders may assert a direct claim. But, as we explained in *Starr*, *Alleghany* did not create a new doctrine of direct standing which would allow shareholders to bypass the requirement that harms to a corporation may only be challenged via derivative claims. *See Starr*, 856 F.3d at 971. Because the action in *Alleghany* was one between the shareholders and the corporation—and not one asserting harm to the corporation, as is the case with corporate overpayment claims— the court "had no occasion to address principles of third-party standing or the distinction between derivative and direct shareholder actions." *Id.* at 970–71. Indeed, the *Alleghany* court made clear it was not considering claims which would need to be asserted derivatively. *See Alleghany*, 353 U.S. at 159–60 ("This is not a case where . . . the injury feared is the indirect harm which may result to every stockholder from harm to the corporation." (internal quotation marks omitted) (citation omitted)). The facts here are meaningfully distinguishable from those in *Alleghany*. We are unpersuaded that *Alleghany* changes the analysis where, as here, the complaints assert claims of corporate overpayment. We conclude that, though directly styled, shareholders' claims are substantively derivative under Delaware law.

Finally, we turn to shareholders' contention in supplemental briefing addressing the impact of *Collins* on these appeals. Shareholders contend that *Collins* not only confirms that, when acting as conservator, the FHFA was acting in its governmental capacity, it also confirms that shareholders have standing to assert their constitutional claims against the government. According to shareholders, because the *Collins* court held that the shareholders there had Article III standing to pursue separation-of-powers

claims, the shareholders in this appeal must also possess standing to pursue their direct claims.

We are not persuaded by shareholders' reading of *Collins*. The shareholders' complaint in *Collins* alleged that HERA's statutory restriction on the President's power to remove the FHFA's Director constituted a separation-of-powers (*i.e.*, Appointments Clause) violation. *Collins*, 141 S. Ct. at 1778. As the Court explained, that claim only required shareholders to establish Article III's minimum standing requirements—injury, causation, and redress. *Id.* at 1779. In concluding that these threshold standing requirements were satisfied in *Collins*, the Court explained that the unique claims at issue there did not derive from the plaintiffs' status as shareholders. Instead, the separation-of-powers claim asserted a right "shared by everyone in the country." *Id.* at 1781.

Here, by contrast, shareholders' claims implicate areas of corporate law that require them to go beyond Article III's standing requirements and establish the right to assert derivative third-party claims on behalf of the corporation. As explained above, only "shareholder[s] with a direct, personal interest in a cause of action," rather than "injuries [that] are entirely derivative of their ownership interests" in a corporation, may bring a direct shareholder action. *Franchise Tax Bd.*, 493 U.S. at 336–37. *Collins* did not change those legal principles. As the Delaware Supreme Court has made clear, moreover, a claim must be asserted derivatively whenever the alleged harm to the shareholders is not "*independent*" of harm to the corporation. *Brookfield*, 261 A.3d at 1272 (emphasis in original). Thus, although the Claims Court dismissed shareholders' claims on standing grounds and we find that shareholders' complaints do not adequately state a claim upon which relief may be granted, we find the Claims Court's reliance on this incorrect ground of dismissal harmless and affirm. *See Harmonia Holdings Grp., LLC v. United States*, 999 F.3d 1397, 1403–04 (Fed. Cir. 2021).

### 2. Cacciapalle's separate takings claim

As described below, the D.C. Circuit held in *Perry II* that HERA's Anti-Injunction Clause[9] barred shareholders' claims for equitable relief, *see Perry II*, 864 F.3d at 613–14, and that HERA's Succession Clause barred all non-constitutional shareholder derivative suits, *see id.* at 624. In Count II of his complaint before the Claims Court, Cacciapalle (a shareholder of the Enterprises) contended that *Perry II*'s ruling constituted a direct taking of private property without just compensation:

> As holders of Preferred Stock, [shareholders] had the right to protect their investment by filing certain causes of action, including derivative lawsuits and claims seeking injunctive and declaratory relief. . . . These causes of action constitute property rights protected by the Fifth Amendment. . . . To the extent Plaintiffs are prevented from receiving a full remedy for the harm caused by the [net worth sweep] by virtue of any court's holding that certain HERA provisions block legal actions needed to fully remedy the harm caused by the [net worth sweep], the application of those provisions to [Cacciapalle's] challenges to the [net worth sweep] constitute a taking of private property without payment of just compensation.

J.A. 853–54 (¶ 134–37).

The Claims Court dismissed Count II of Cacciapalle's complaint, reasoning that it impermissibly collaterally attacked *Perry II*'s holding. *See Cacciapalle*, 148 Fed. Cl. at 772 (citing, *inter alia*, *Campbell v. United States*, 932 F.3d

---

9    HERA's Anti-Injunction Clause reads: "no court may take any action to restrain or affect the exercise of powers or function of the [FHFA] as a conservator or receiver." 12 U.S.C. § 4617(f).

1331, 1340 (Fed. Cir. 2019) for the proposition that the Claims Court cannot entertain a constitutional claim that requires scrutinizing the actions of another tribunal). Cacciapalle appeals this decision, arguing that the Claims Court mischaracterized his claim as a collateral attack on *Perry II*, as well as a judicial taking. *See* Cacciapalle Suppl. Opening Br. 16–17. According to Cacciapalle, Count II instead asserts a direct takings claim under the Fifth Amendment because it contends that, as interpreted in *Perry II*, HERA is a regulatory taking of shareholders' rights to assert derivative claims and seek injunctive relief in connection with such claims. *See id.* at 18. In other words, Cacciapalle says he agrees with *Perry II*'s conclusion that the Succession Clause bars the assertion of derivative claims on behalf of the Enterprises. He says that *because* HERA clearly does that, it operates as a taking of his property right to assert derivative claims on behalf of the Enterprises.

However characterized, Count II of Cacciapalle's complaint must still be dismissed. First, *Perry II* did not hold that the Succession Clause is broad enough to bar derivative constitutional claims. *See Perry II*, 864 F.3d at 614 ("[HERA] does not prevent either constitutional claims (none are raised here) or judicial review through cognizable actions for damages like breach of contract."). Thus, to the extent Cacciapalle purports to sweep his constitutional derivative claims into Count II, by his own reasoning he has failed to assert a claim upon which relief may be granted. Second, even assuming that the right to assert non-constitutional derivative claims is a property right for Fifth Amendment purposes, the corporation on whose behalf a shareholder wishes to bring such a claim must itself possess an underlying cause of action that it could plausibly assert. While Count II is silent regarding the nature of the claim Cacciapalle would assert on behalf of the Enterprises if he could, the only one identified in his complaint or any of his briefing is a claim that the FHFA breached its

fiduciary duties to the Enterprises when it implemented the net worth sweep.  The problem for Cacciapalle is that *Perry II*, the very case he says he "do[es] not challenge" and is both "correct and final," Cacciapalle Suppl. Opening Br. 18, concluded that the FHFA owed no fiduciary duties to the Enterprises, as conservator or otherwise, *Perry II*, 864 F.3d at 625.  As we explained above, moreover, the Supreme Court has since confirmed that the FHFA was authorized to adopt the net worth sweep without regard to the interests of the Enterprises or its shareholders.  *See Collins*, 141 S. Ct. at 1777.  Thus, even if the Claims Court was wrong to characterize Count II of Cacciapalle's complaint as a collateral attack on the reasoning in *Perry II*, it was correct to dismiss that claim.  There is simply no claim embedded in that count upon which relief may be granted.

### C. Shareholders' direct non-constitutional claims

#### 1. Breach of implied-in-fact contract

Shareholders again proffer both joint and individual arguments on appeal as to why we should overturn the Claims Court's dismissal of their direct breach of contract claims.  We address each in turn.

##### a. Joint arguments regarding the contract claims

Under the Tucker Act, the Claims Court has jurisdiction "to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).  The Claims Court dismissed shareholders' direct breach of implied-in-fact contract claims, holding that it lacked subject matter jurisdiction under the Tucker Act.  *See, e.g.*, *Fairholme*, 147 Fed. Cl. at 41.  The Claims Court explained that, even if an implied-in-fact contract existed between the FHFA and the Enterprises where—despite its statutory authority not to do so—the FHFA chose to agree to operate the Enterprises for the shareholders' benefit, the shareholders failed to sufficiently allege their status as

third-party beneficiaries of that alleged contract. *Id.* at 42. On appeal, the shareholders contend that the Claims Court erred in this finding and urge us to reinstate this directly pled claim. We decline to do so.

An implied-in-fact contract is one "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998) (quoting *Balt. & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597 (1923)). Like an express contract, an implied-in-fact contract requires: (1) mutuality of intent to contract; (2) consideration; and (3) unambiguous offer and acceptance. *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990). When the government is a party, an implied-in-fact contract also requires that (4) the government representative whose conduct is relied upon must have actual authority to bind the government in contract. *Id.*

As a general rule, for purposes of Tucker Act jurisdiction, the government consents to be sued only by those with whom it has privity of contract. *Fid. & Guar. Ins. Underwriters, Inc. v. United States*, 805 F.3d 1082, 1087 (Fed. Cir. 2015). There are exceptions to this general rule, including that intended third-party beneficiaries may bring suits against the government. *First Hartford*, 194 F.3d at 1289. "Third party beneficiary status is an 'exceptional privilege.'" *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001) (quoting *German All. Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912)). The requirements for establishing such status are "stringent." *Anderson v. United States*, 344 F.3d 1343, 1352 (Fed. Cir. 2003). "[S]hareholders seeking status to sue as third-party beneficiaries of an allegedly breached contract must 'demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects

an intention to benefit the party directly.'" *Castle v. United States*, 301 F.3d 1328, 1338 (Fed. Cir. 2002) (quoting *Glass*, 258 F.3d at 1354). Specifically, "the contract must express the intent of the [promisor] to benefit the shareholder personally, independently of his or her status as shareholder." *Glass*, 258 F.3d at 1353–54. One way to ascertain the presence of that intent is to determine "whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right" on her. *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997) (citing *Restatement (Second) of Contracts* § 302(1)(b) & cmt. d (Am. L. Inst. 1981)).

Here, even assuming shareholders have sufficiently alleged the requisite facts to establish an implied-in-fact contract with the Enterprises, their complaints still do not establish third-party beneficiary status. As the complaints state, the FHFA and the Enterprises did not enter into the implied-in-fact contract to benefit shareholders; they, instead, entered the conservatorship to "'preserve and conserve the [Enterprises'] assets and property' and restore the [Enterprises] to a 'sound and solvent condition.'" J.A. 478 (¶ 260); J.A. 530 (¶ 132); J.A. 796 (¶ 163). Although shareholders may indirectly benefit from the terms of the alleged implied-in-fact contract, that alone is not enough to establish third-party beneficiary status. *See FDIC v. United States*, 342 F.3d 1313, 1320 (Fed. Cir. 2003) (holding that indirect benefits resulting solely from being a shareholder, without more, are insufficient to establish third-party beneficiary status). As we explained *supra*, moreover, in *Collins*, at the time of the alleged contract, HERA expressly authorized the FHFA, as conservator, to act in ways which were not designed to benefit either the Enterprises *or* its shareholders. *See supra*, at 15–16. We therefore affirm the Claims Court's decision to dismiss shareholders' direct breach of contract claims. Again, although the Claims Court dismissed on jurisdictional grounds and we find that the complaints do not state a

claim upon which relief may be granted, we find this alternative ground for dismissal harmless. *See Harmonia Holdings Grp.*, 999 F.3d at 1403–04.

### b. Cacciapalle contract claim

Cacciapalle's breach of contract claim alleges that his stock certificates established a contract between shareholders and the Enterprises guaranteeing him certain rights to dividends, liquidation preferences, and voting rights, and contained an implied covenant of good faith and fair dealing. *See* J.A. 855–57. Once the FHFA assumed its role as conservator, Cacciapalle contends that these contracts became contracts between shareholders and the United States. *Id.* Before the Claims Court, Cacciapalle argued that the FHFA breached these contracts by executing the net worth sweep. *See Cacciapalle*, 148 Fed. Cl. at 779.

The Claims Court held that Cacciapalle lacked standing to pursue these allegations because he failed to establish that he was in contractual privity with the United States. *Id.* The Claims Court declined Cacciapalle's invitation to find that *First Hartford* established any applicable exception to the general requirement that, to pursue a claim for breach of contract against the United States, a party must first establish that it is in privity with the United States. *Id.* Noting that the unifying principle behind the privity exceptions on which Cacciapalle relied requires "the party standing outside of privity by contractual obligation [to] stand[] in the shoes of a party within privity," the Claims Court found that Cacciapalle had cited no legal authority to support his assertion that the FHFA, as conservator, stood in the shoes of the Enterprises. *Id.* at 780 (citing *First Hartford*, 194 F.3d at 1289).

Cacciapalle contends on appeal that the Claims Court misunderstood the basis of his argument. Rather than analogize the facts of his complaint to those in *First Hartford* to assert that the FHFA as conservator stepped into

the Enterprises' shoes, Cacciapalle now insists that he relies on HERA's Succession Clause for this proposition. Because HERA states that the FHFA "shall, as conservator or receiver, and by operation of law, immediately succeed to . . . all rights, titles, powers, and privileges of [the Enterprises]," Cacciapalle argues that the conservatorship caused the FHFA to succeed to the Enterprises' contractual obligations. Cacciapalle Suppl. Opening Br. 26–27. And, because the FHFA "retains [its] government character" as conservator, Cacciapalle argues that he has established privity of contract with the United States. *Id.* at 28.

Though creative, we disagree that Cacciapalle may pursue his contract claim. HERA establishes that the FHFA may act in a governmental capacity: "the [FHFA] . . . shall be an independent agency of the Federal Government." 12 U.S.C. § 4511(a). As discussed above, *Collins* made clear that the FHFA retains its governmental character whenever it interprets federal law to undertake an action (such as interpreting HERA's Best Interests clause when adopting the net worth sweep). *See supra*, at 15–16 (citing *Collins*, 141 S. Ct. at 1776–77, 1785–86). But, in cases involving hybrid entities exercising traditional governmental functions and private commercial ones, the Supreme Court has also held that "suits based on a public corporation's *commercial* activity may proceed as they would against a private company." *Thacker v. Tenn. Valley Auth.*, 139 S. Ct. 1435, 1439, 1443 (2019) (emphasis in original); *see also Montilla*, 999 F.3d at 757 (holding that the FHFA as conservator did not act in any governmental capacity when it succeeded to the Enterprises' private contractual rights and nonjudicially foreclosed on certain properties).

In succeeding to the Enterprises' private contractual agreement with Cacciapalle, we conclude the FHFA does not retain its governmental character. Unlike the FHFA's adoption of the net worth sweep—which, as discussed above, necessarily required the FHFA to exercise its

statutory power to subordinate the Enterprises' and shareholders' best interests to its own, *see supra*, at 15–16—succeeding to the preexisting contracts between the Enterprises and Cacciapalle does not implicate any such governmental activity. To be sure, Cacciapalle's complaint makes clear that the FHFA's succession to the Enterprises' obligations only involves interpreting contractual terms, not federal law. *See* J.A. 856 (¶ 153) ("FHFA assumed the responsibility to act consistently with the [Enterprises'] contractual obligations when it became the [Enterprises'] conservator."). Because Cacciapalle's breach of contract claim fails to implicate any governmental activity on the FHFA's part, the requisite privity of contract with the United States is absent. *See Erickson Air Crane Co. of Wash. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984) (holding that the "government consents to be sued only by those with whom it has privity of contract"). We, thus, affirm the Claims Court's decision to dismiss these claims on standing (privity) grounds. To the extent Cacciapalle has a contract claim, it cannot be asserted against the United States.

## 2. Breach of fiduciary duty

The Tucker Act also provides the Claims Court with subject matter jurisdiction over claims "against the United States founded . . . upon . . . liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Although a claim for breach of fiduciary duty is normally classified as a tort, *see Newby v. United States*, 57 Fed. Cl. 382, 294 (2003), the Claims Court has jurisdiction over claims alleging the breach of a fiduciary duty that the government "specifically accepts by statute or regulation." *Hopi Tribe v. United States*, 782 F.3d 662, 667 (Fed. Cir. 2015). The Claims Court also has jurisdiction over a plaintiff's breach of fiduciary duty claim "grounded in a contractually based obligation" to the plaintiff. *Cleveland Chair Co. v. United States*, 557 F.2d 244, 246 (Ct. Cl. 1977).

The Claims Court held that it lacked subject matter jurisdiction under the Tucker Act to hear shareholders' directly pled fiduciary duty claims because they sounded in tort. The Claims Court first reasoned that HERA was not a statutory source for any fiduciary duties of the FHFA to shareholders because it provides that, as conservator, the FHFA was only required to act in the interests of itself or the Enterprises. *Fairholme*, 147 Fed. Cl. at 38 (citing 12 U.S.C. § 4617(b)(2)(J)). The court explained that 12 U.S.C. § 4617(b)(2)(J) "reflects a clear intent: the FHFA [as conservator] does not owe a fiduciary duty to shareholders because the conservator is not required to consider shareholders' interests." *Id.* Similarly, although Congress directed the Treasury Secretary to consider, e.g., the need to maintain the Enterprises as privately owned companies before purchasing securities under HERA, the court declined to find a fiduciary relationship between Treasury and the shareholders "based on any incidental benefit shareholders may derive" from the consideration of that need. *Id.* at 39.

The Claims Court also reasoned that the PSPAs did not confer a fiduciary duty on Treasury—as the controlling shareholder—to the other shareholders. The Claims Court noted that shareholders' allegations are "not founded on a contract within the meaning of the Tucker Act" but premised on "the application of state-law principles." *Id.* The court further noted that the shareholders failed to explain why it should or could draw on state-law tort principles here. *Id.*

Shareholders appeal the Claims Court's holding. First, they argue that the FHFA has fiduciary duties to shareholders because, under HERA, the FHFA is a conservator that "obtains total control of an entity, with a view to preserving and conserving its assets, making it sound and solvent, and carrying on its business." Appellants' Joint Opening Br. 73 (citing 12 U.S.C. § 4617(b)(2)(A), (B), (D)). Shareholders analogize HERA to FIRREA and cite to other

cases where courts have recognized that the FDIC owes fiduciary duties to the creditors and shareholders of the banks for whom it is a receiver.  Shareholders contend that the provision in HERA permitting the FHFA to take any action that is in the best interest of the Enterprises or the agency is an additional requirement that is "entirely consistent with recognizing that [the agency] has a fiduciary duty to shareholders." *Id.* at 75–76.  Second, shareholders argue that, because the PSPAs made Treasury a controlling shareholder of the Enterprises, the Treasury owes fiduciary duties to the remaining shareholders, even if the FHFA as conservator does not.  They contend that the Tucker Act's jurisdictional grant is broad and that the allegedly breached fiduciary duty need not be stated in the terms of the contract but can arise from contract terms as a matter of law.  They also contend that the court should have looked to state-law principles to inform the terms of the contract arising from the PSPAs.

We do not find shareholders' arguments that HERA provides a source of fiduciary duty availing.  The Supreme Court's analysis of HERA in *Collins* is highly instructive.  Notably, the Supreme Court held that, because HERA authorizes the FHFA to act in the best interests of the Enterprises *or itself*, the agency "may aim to rehabilitate the [Enterprises] in a way that, while not in the best interests of the [Enterprises], is beneficial to the [FHFA] and, by extension, the public it serves."  *Collins*, 141 S. Ct. at 1776; *see* 12 U.S.C. § 4617(b)(2)(J)(ii).  The Court added that the FHFA lawfully adopted the net worth sweep, "[w]hether or not this new arrangement was in the best interests of the companies *or their shareholders*."  *Collins*, 141 S. Ct. at 1777 (emphasis added).  Because the FHFA could adopt the net worth sweep without regard for the interests of the shareholders, we hold that the agency owed no fiduciary duties to the shareholders under HERA.

We disagree with the shareholders that 12 U.S.C. § 4617(b)(2)(A), (B), and (D) gave rise to fiduciary duties

owed by the FHFA to shareholders. Those provisions—
which outline the FHFA's powers and duties as conservator
and empower the FHFA to preserve and conserve the as-
sets and property of the Enterprises or to carry on the busi-
ness of the Enterprises—are permissive, not mandatory:
"[t]he [FHFA] *may*, as conservator, take such action as may
be . . . appropriate to carry on the business of the [Enter-
prises] and preserve and conserve the assets and property
of the [Enterprises]." 12 U.S.C. § 4617(b)(2)(D)(ii) (empha-
sis added). This precatory language cannot fairly be said
to establish a fiduciary duty owed to shareholders. As the
D.C. Circuit concluded in *Perry II*, "the most natural read-
ing of [HERA] is that it permits FHFA, but does not compel
it in any judicially enforceable sense, to preserve and con-
serve [the Enterprises'] assets and to return the [Enter-
prises] to private operation." 864 F.3d at 607. We are also
not persuaded by case law recognizing fiduciary duties in
the context of the FDIC when acting as receiver under
FIRREA. The Supreme Court's analysis in *Collins* is more
persuasive authority because it both dealt with HERA and
considered the FHFA's rights and obligations *as conserva-
tor*. And the Court's conclusion that 12 U.S.C.
§ 4617(b)(2)(J) permits the FHFA to act without regard to
the best interests of the shareholders refutes the share-
holders' argument that the provision is an additional re-
quirement consistent with the creation of a fiduciary duty
to shareholders; it, in fact, negates such a duty. *See Col-
lins*, 141 S. Ct. at 1777; *see also Perry II*, 864 F.3d at 608
(distinguishing HERA from FIRREA because FIRREA per-
mits the FDIC to consider the interests of depositors while
HERA refers only to the best interests of the Enterprises
and the FHFA).

   We are also unpersuaded by shareholders' contentions
that the PSPAs imposed on the Treasury a fiduciary duty
to the shareholders. Instead, we agree with the D.C. Cir-
cuit's analysis and reasoning in *Perry II*. There, the court
considered whether the Administrative Procedure Act

(APA) waived sovereign immunity for the plaintiffs' claims that the Treasury, as a controlling shareholder of the Enterprises, violated its fiduciary duties to the shareholders by executing the net worth sweep.[10]  *Perry II*, 864 F.3d at 617.  The D.C. Circuit found that subject matter jurisdiction over the plaintiffs' claims was proper because they were not founded upon a contract.  *Id.* at 619–21 ("These claims against Treasury . . . do not seek to enforce any duty imposed upon Treasury by the [PSPAs].").  The court specifically rejected the view that "*any* case requiring *some* reference to . . . a contract is necessarily . . . *on the contract* and therefore directly within the Tucker Act."  *Id.* (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982)).

The D.C. Circuit's reasoning in *Perry II* is helpful here; the shareholders' direct breach of fiduciary duty claims are substantively similar to the claims in *Perry II*.  Here, the shareholders contend that the Treasury, as a controlling shareholder of the Enterprises, breached its fiduciary duties to the shareholders by entering into the net worth sweep.  *E.g.*, J.A. 528–29 (¶¶ 125–26).  They invoke the PSPAs only to establish that the Treasury owns warrants to 79.9% of the Enterprises' common stock and therefore is a controlling shareholder.  This reference to the impact of the PSPAs does not change the fact that their breach of fiduciary duty claims are founded on state common-law obligations that a controlling shareholder generally owes to minority shareholders, not the PSPAs.  The Claims Court correctly recognized that shareholders failed to allege a breach of fiduciary duty claim against Treasury founded on

---

[10]  The APA's waiver provision does not apply "if any other statute that grants consent to suit," including the Tucker Act, "expressly or impliedly forbids the relief which is sought."  *Perry II*, 864 F.3d at 617 (quoting 5 U.S.C. § 702).

a contract.[11]  We hold that the Claims Court correctly dismissed all the shareholders' direct fiduciary duty claims for lack of subject matter jurisdiction.

## IV. BARRETT'S DERIVATIVE CLAIMS

### A. The derivative non-constitutional claims

As mentioned above, shareholders of the Enterprises challenged the net worth sweep in various other fora.  One such challenge involved a class action against the FHFA and Treasury over the net worth sweep in the United States District Court for the District of Columbia.  *See Perry I*, 70 F. Supp. 3d 208.  Relevant here, class plaintiffs derivatively pled that the FHFA had breached its fiduciary duties to the Enterprises.  *Id.* at 218.  The district court dismissed class plaintiffs' derivative claims, reasoning that HERA's Succession Clause unambiguously bars shareholder derivative suits because it transferred all the shareholders' rights, including their rights to assert claims on behalf of the Enterprises, to the FHFA.  *Id.* at 229–30 (citing 12 U.S.C. § 4617(b)(2)(A)(i)).    The district court

---

[11] We see no inconsistency between the Claims Court's treatment of state-law principles here and its analysis of state-law principles to determine whether the shareholders' direct takings and illegal exaction claims are substantively derivative.  As to the breach of fiduciary duty claims, the Claims Court addressed an issue of subject matter jurisdiction—whether the claims were founded on a contract with the United States or were for liquidated or unliquidated damages in cases not sounding in tort.  By contrast, as to the takings and illegal exaction claims, the Claims Court addressed the distinct issue of third-party standing.  For those claims, there was no dispute that the Claims Court had subject matter jurisdiction; the claims were founded upon the Constitution.  References to state law there were to inform the third-party standing inquiry.

declined class plaintiffs' invitation to read a conflict-of-interest exception into HERA's Succession Clause. *See id.* at 230 (citing *Kellmer v. Raines*, 674 F.3d 848, 850 (D.C. Cir. 2012)).

Class plaintiffs appealed, *inter alia*, this portion of the district court's ruling in *Perry I*. *See Perry II*, 864 F.3d 591. The *Perry II* court affirmed, holding that, without exception, HERA's Succession Clause barred non-constitutional derivative shareholder suits. *See id.* at 623–25. The D.C. Circuit disagreed with class plaintiffs that the Succession Clause contained an implicit conflict-of-interest exception, reasoning that "it makes little sense to base an exception to the rule against derivative suits in the Succession Clause on the purpose of the derivative suit mechanism, rather than the plain statutory text to the contrary." *Id.* at 625 (internal quotation marks and citation omitted). In doing so, it acknowledged, but refused to follow, our conclusion in *First Hartford* that an identical succession clause in FIRREA was subject to a conflict-of-interest exception. *Id.*

Before the Claims Court, the government argued that Barrett was collaterally estopped from pursuing his derivative claims because *Perry I* and *II* dealt with the same issue before the Claims Court: whether the class of shareholders had standing to pursue non-constitutional derivative claims. *See Fairholme*, 147 Fed. Cl. at 47. The Claims Court disagreed, noting that, because shareholders in *Perry I* and *II* could not assert derivative claims due to HERA's Succession Clause, they did not adequately represent Barrett's interests in this case. *Id.* at 48.

In its cross-appeal, the government contends that the Claims Court erroneously ignored the fact that the *Perry* line of cases resolved a threshold question that extends to *any* plaintiff who tries to bring a derivative suit on the Enterprises' behalf. Gov't Resp. Br. 76–78. Barrett responds by arguing that, because *Perry II* held that HERA's Succession Clause barred derivative shareholder suits, the

decision was tantamount to dismissing the class plaintiffs'
suit "on the ground that the shareholders who sued lacked
the legal capacity to represent the [Enterprises]." Appel-
lants' Joint Reply Br. 92 (citing *Fairholme*, 147 Fed. Cl. at
47–48). This incapacity to represent the Enterprises, Bar-
rett reasons, leads to the conclusion that Barrett is not col-
laterally estopped because his interests were not
adequately represented in *Perry II*. Appellants' Joint Re-
ply Br. 92; *see also* Appellants' Joint Reply Br. 94 ("When a
putative shareholder derivative suit is dismissed on the
theory that the plaintiff is legally prohibited from repre-
senting the corporation in litigation, the judgment cannot
bind the corporation or its other shareholders."). Barrett
also contends that the issues are not identical: *Perry II* only
involved derivatively pled breach of fiduciary duty claims,
whereas here, Barrett pled both a breach of fiduciary duty
and breach of contract claim, as well as derivative consti-
tutional claims. Appellants' Joint Reply Br. 95–96. Share-
holders also jointly argue that, because the Supreme Court
in *Collins* found standing for plaintiffs asserting constitu-
tional rights notwithstanding HERA's Succession Clause,
we should find standing here. *See* Fairholme Suppl. Br. on
*Collins* 13–14.

We agree with the government that Barrett is collater-
ally estopped from re-litigating whether HERA's Succes-
sion Clause bars his non-constitutional derivative claims.
Issue preclusion bars successive litigation when the follow-
ing elements are met: (1) "[t]he issue previously decided is
identical with the one presented in the action in question";
(2) "[t]he prior action has been finally adjudicated on the
merits"; (3) "[t]he party against whom the doctrine is in-
voked was a party, or in privity with a party, to the prior
adjudication"; and (4) "[t]he party against whom the doc-
trine is raised had a full and fair opportunity to litigate the
issue in the prior action." *Jones v. United States*, 846 F.3d
1343, 1361 (Fed. Cir. 2017).

We first disagree with both the shareholders and the Claims Court that, because *Perry II* concluded that HERA bars shareholders from bringing derivative claims, the class plaintiffs there did not adequately represent the interests of all shareholders. The Supreme Court in *Taylor v. Sturgell*, 553 U.S. 880 (2008) held that "[a] party's representation of a nonparty is adequate for preclusion purposes only if, at a minimum: (1) [t]he interests of the nonparty and her representative are aligned . . . and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." *Id.* at 900 (internal quotation marks and citations omitted).

Here, the *Perry II* court affirmatively answered the question of whether HERA's Succession Clause bars all non-constitutional derivative shareholder suits. On this issue, the interests of the *Perry II* class plaintiffs and Barrett are "aligned." *See id.* The class plaintiffs and Barrett both sought to bring derivative state law claims on the Enterprises' behalf to challenge the net worth sweep. And they both advocated for an interpretation of the Succession Clause that recognizes a conflict-of-interest exception. *See, e.g., Perry II*, 864 F.3d at 625; *Fairholme*, 147 Fed. Cl. at 49.

In litigating the applicability of HERA's Succession Clause to derivative claims, the class plaintiffs in *Perry I* and *II* also understood themselves to be "acting in a representative capacity." As the court in *Perry I* noted, "[t]he purported class plaintiffs consist of private individual and institutional investors who own either preferred or common stock in the [Enterprises]." *Perry I*, 70 F. Supp. 3d at 214. Because shareholders' complaints note that Barrett "has continuously owned shares of [the Enterprises] since September 2008," we find that Barrett falls under the class described in the *Perry* cases. J.A. 398 (¶ 31). And the pure legal question of whether HERA's Succession Clause bars all non-constitutional derivative shareholder claims is not

applicable only to certain shareholders.  It, instead, applies
to any shareholder attempting to bring a derivative claim
on the Enterprises' behalf.  Indeed, while the particular
named shareholders pursuing derivative lawsuits that
challenge the net worth sweep may change from case to
case, HERA's statutory text does not.  Barrett was, thus,
adequately represented by the class plaintiffs in *Perry I*
and *II*.  The fact that the plaintiffs in *Perry I* and *Perry II*
failed to convince the D.C. courts that their non-constitu-
tional claims were not barred by the Succession Clause
does not mean they failed to represent Barrett's interests
on that point.  *See In re Sonus Networks, Inc, S'holder De-
rivative Litig.*, 499 F.3d 47, 64 (1st Cir. 2007).

We are also unconvinced by shareholders' contentions
that collateral estoppel does not apply here because Bar-
rett's derivative non-constitutional claims do not perfectly
coincide with the derivative breach of fiduciary duty claims
at issue in *Perry II*.[12]  The Supreme Court has held that
collateral estoppel applies, "even if the issue recurs in the
context of a different claim." *Taylor*, 553 U.S. at 892.  Here,
regardless of what the derivative non-constitutional claims
entail, the issue subject to collateral estoppel remains
whether HERA bars those claims vis à vis its Succession
Clause.  Because the class plaintiffs in *Perry II*, who ade-
quately represented Barrett's interests, already litigated
this question, we find that issue preclusion principles mil-
itate in favor of collaterally estopping Barrett from re-liti-
gating it.  The four issue-preclusion elements outlined in
*Jones* are met.  The Claims Court, therefore, erred by not
finding collateral estoppel applicable here.

---

[12]   To the extent shareholders contend that issue pre-
clusion does not apply to their derivative constitutional
claims, we agree.  As detailed in the next section, however,
we hold that shareholders' derivative constitutional claims
fail for independent reasons.

Shareholders' joint arguments based on *Collins* do not require a different result. As discussed above, in response to a separation-of-powers challenge to HERA's restrictions on the President's ability to remove the FHFA Director, the Supreme Court found that the shareholders had standing to litigate those claims, despite HERA's Succession Clause, because "the right asserted . . . is a right shared by everyone in this country." *Collins*, 141 S. Ct. at 1781. That is not the case here, where Barrett is attempting to derivatively sue on behalf of the Enterprises' rights to assert its interests in its net worth.

### B. Barrett's constitutional derivative claims

We finally turn to Barrett's constitutional derivative claims. Because the *Perry II* court never decided any constitutional claims and expressly pointed out that it had no occasion to do so, we decline to dismiss these claims on the ground that Barrett is collaterally estopped from asserting them. *See Perry II*, 864 F.3d at 606 n.7. That leaves us to decide whether Barrett's claims are barred by the Succession Clause or are subject to dismissal on other grounds.

The Claims Court held that Barrett had standing to pursue his constitutional claims, despite the Succession Clause. *See Fairholme*, 147 Fed. Cl. at 47. To arrive at that conclusion, the Claims Court relied on our precedent in *First Hartford*. *Id.* at 49. Reasoning that a conflict of interest would arise if the FHFA were to decide whether to sue itself over the net worth sweep in a direct suit, the Claims Court applied the conflict-of-interest exception that our court established in *First Hartford* to conclude that HERA's Succession Clause did not deprive Barrett of standing to bring his constitutional derivative claims. *See id.* at 49–51.

The government cross-appeals the Claims Court's reliance on *First Hartford* and argues that Barrett lacks standing to assert his derivative claims. Among other things, the government argues that *First Hartford* must be limited

to the specific FIRREA context in which it arose.  It contends that HERA's statutory construct makes clear that its Succession Clause "admits of no exceptions."  Gov't Resp. Br. 79.  Because we conclude that, as a matter of law, Barrett failed to state a claim upon which relief may be granted in either his takings or illegal exaction derivative claims, we reverse the Claims Court on those issues, without the need to address *First Hartford*.[13]

### 1. Barrett's takings claims

The Fifth Amendment provides that the United States may not take private property for public use without just compensation.  *See* U.S. Const. amend. V.  To adequately plead a takings claim, claimants must identify an authorized government action that deprived them of their property interest.  *Short v. United States*, 50 F.3d 994, 1000 (Fed. Cir. 1995).  Government action may result in a compensable taking if it either involves the physical invasion of property or an extensive restriction on the use of property.  *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 430 (1982).  Relevant to this appeal, regulatory action constitutes a per se taking when it "completely deprive[s] an owner of '*all* economically beneficial us[e]' of

---

[13]  We note, however, that both the *Collins* court and the *Perry II* court concluded that the FDIC's authority as receiver under FIRREA is very different from the FHFA's authority as conservator under HERA.  *See Collins*, 141 S. Ct. at 1785 ("[A]s we have already mentioned, . . . the FHFA's powers under [HERA] differ critically from those of most conservators and receivers."); *see also Perry II*, 864 F.3d at 608 ("Notably, while FIRREA explicitly permits FDIC to factor the best interests of depositors into its conservatorship judgments, [HERA] refers only to the best interests of FHFA and the [Enterprises]— and *not* those of the [Enterprises'] shareholders or creditors.").

her property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (quoting *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1019 (1992)). The Supreme Court has explained that whether a government action constitutes a taking involves an ad hoc inquiry where several factors are relevant: (1) the economic impact of the regulation; (2) the extent to which the regulation interferes with investment-backed expectations; and (3) the character of the governmental action. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

Here, Barrett's derivative takings claims allege that the net worth sweep constituted a regulatory taking because it deprived the Enterprises of "all economically beneficial uses" of their net worth. J.A. 464 (¶ 181); J.A. 465 (¶ 190). As a matter of law, Barrett fails to state a claim upon which relief may be granted. Supreme Court case law has long held that the right to exclude is an essential element of property ownership. *See Loretto*, 458 U.S. at 435–36 ("The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." (citation omitted)). And our case law is clear that regulated financial entities lack the fundamental right to exclude the government from their property when the government could place the entities into conservatorship or receivership. *See Cal. Hous. Sec., Inc. v. United States*, 959 F.2d 955, 958 (Fed. Cir. 1992) ("Saratoga lacked the fundamental right to exclude the government from its property at those times when the government could legally impose a conservatorship or receivership on Saratoga."); *see also Golden Pac. Bancorp. v. United States*, 15 F.3d 1066, 1074 (Fed. Cir. 1994) ("At those times when the Comptroller could legally inspect the Bank or place it in receivership, the Bank . . . was unable to exclude the government from its property.").

When Congress passed HERA in 2008, it gave the FHFA the unrestricted authority to place the Enterprises into conservatorship or receivership. *See* 12 U.S.C.

§ 4617(a). And, as *Collins* explains, HERA gave the FHFA very broad authority, as conservator, to act in ways that are not in the best interests of the Enterprises. *Collins*, 141 S. Ct. at 1776. As of at least 2008, then, the Enterprises lost their right to exclude the government from their property, including their net worth. They also lost the right to complain if and when the FHFA chose to elevate its interests, and the interests of the public, above the interests of the Enterprises. Without this right to exclude, the Enterprises lack any cognizable property interest on which Barrett may base a derivative Fifth Amendment takings claim. *See Golden Pac.*, 15 F.3d at 1074. This conclusion is bolstered, moreover, by the fact that the Enterprises consented to the conservatorship, and consented to one where the conservator had extremely broad statutory powers. Because the Enterprises lacked the right to exclude the government from their net worth after the passage of HERA, and especially after the imposition of the conservatorship, they had no investment-backed expectation that the FHFA would protect their interests and not dilute their equity. We find, accordingly, that the Claims Court erred in failing to dismiss Barrett's derivative takings claim under Rule of the Court of Federal Claims 12(b)(6). While this logic applies equally to Barrett's derivatively pled illegal exaction claims, there are additional reasons his illegal exaction claim fails, which we address below.[14]

---

[14] Because the plaintiffs in *Golden Pacific* included the bank's shareholders (as well as the regulated entity), our reasoning here would apply to the shareholders' direct takings claims—including those asserted by Fairholme and Cacciapalle. Because we affirm dismissal of those claims on independent grounds, we need not rely on their lack of a cognizable property interest to do so.

### 2. Barrett's illegal exaction claim

Unlike a Fifth Amendment takings allegation, which involves lawful government action, illegal exaction claims "involve[] money that was 'improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'" *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005) (citation omitted). Barrett's complaint alleges that HERA did not authorize the "FHFA or Treasury to expropriate [the Enterprises'] net worth for the benefit of the Government." J.A. 468 (¶ 206); *see also* J.A. 470 (¶ 216). In other words, he claims the FHFA exceeded the bounds of its statutory authority in connection with the net worth sweep. The Claims Court denied the government's motion to dismiss Barrett's claims, reasoning that he had stated enough facts in his complaint to sufficiently allege an illegal exaction. *See Fairholme*, 147 Fed. Cl. at 51–52. After the Supreme Court's recent ruling in *Collins*, it is clear that Barrett fails to state a plausible derivative illegal exaction claim. We therefore reverse the Claims Court's holding to the contrary.

Barrett fails to state a plausible illegal exaction claim under the theory that the FHFA's adoption of the net worth sweep exceeded the agency's statutory authority. In *Collins*, shareholders of the Enterprises also alleged that the FHFA exceeded its statutory authority under HERA by agreeing to the net worth sweep. 141 S. Ct. at 1775. The Supreme Court disagreed. *Id.* Citing HERA's grant of authority to the FHFA to act "in the best interests of the [Enterprises] *or the* [*FHFA*]," the Supreme Court reasoned that, "when the FHFA acts as a conservator, it may aim to rehabilitate the [Enterprises] in a way that, while not in the best interests of the [Enterprises], is beneficial to the [FHFA] and, by extension, the public it serves." *Id.* at 1776. Because "the FHFA could have reasonably concluded that it was in the best interests of members of the public who rely on a stable secondary mortgage market" to adopt the

net worth sweep, the Court concluded that the net worth sweep was well within the FHFA's statutory authority under HERA. *Id.* at 1777; *accord Perry II*, 864 F.3d at 607 ("FHFA's execution of the [net worth sweep] falls squarely within its statutory authority . . . ."). *Collins* makes clear that Barrett cannot plausibly allege an illegal exaction claim predicated on his contention that adopting the net worth sweep fell outside the FHFA's statutory authority.

We, thus, reverse the Claims Court's refusal to dismiss Barrett's illegal exaction claim to the extent that that claim is predicated on his contention that the net worth sweep was beyond the scope of the FHFA's authority under HERA.

### 3. Barrett's separation-of-powers claim

The final issue we must address is whether the Claims Court erred in allowing Barrett's separation-of-powers claim to proceed.[15] The Claims Court was correct that Barrett had standing to allege a separation-of-powers violation. *Collins* answers that question for us. *Collins*, 141 S. Ct. at 1781. And the Claims Court was correct to the extent it concluded that Barrett asserted a plausible separation-of-powers violation. Indeed, the *Collins* court decided that the for-cause removal provision relating to removal of the Director of the FHFA violates separation-of-powers principles. But that does not end our inquiry.

---

[15]    Barrett included his objection to the fact that the Director of the FHFA was not removable at will when the net worth sweep was both implemented and remained in place within his illegal exaction claim. While that characterization of a separation-of-powers cause of action is incorrect, we do not find that the label placed on his separation-of-powers claim changes our analysis regarding Barrett's ability to assert it.

The problem for Barrett is that there is no viable remedy available to him relating to this structural defect. First, as the Supreme Court pointed out in *Collins*, the FHFA and Treasury entered into a fourth amendment in 2019 which eliminated the variable dividend formula the shareholders claim caused their injury. That amendment eliminated any claim for prospective relief which shareholders could assert with respect to the net worth sweep. Second, the *Collins* court also explained that, because the net worth sweep was implemented under the direction of an *acting* Director, rather than a permanent, congressionally-confirmed Director, the original implementation of the net worth sweep could not be attacked. In other words, because the acting Director was removable at will, his actions were not constitutionally infirm. That means the only possible remedy other than severance of the unconstitutional for-cause discharge provision—which the *Collins* court has already effectuated—would be possible relief for retroactive harm caused by any confirmed Director's actions in not undoing the net worth sweep. That extremely limited potential harm is even more minimized by the fact that, while there were confirmed Directors under both Presidents Obama and Trump, their terms were limited, with an acting Director serving between the two (whose implementation decisions are as unassailable as those of the acting Director who implemented the net worth sweep). And, as the Fifth Circuit concluded, we may take judicial notice of the fact that the acting Director under President Obama filed multiple court filings approving of the net worth sweep with no opposition from the President, and the confirmed Director under President Trump never filed anything indicating opposition to it, which the President could have asked him to do. *See Collins v. Mnuchin*, 938 F.3d 553, 594–95 (5th Cir. 2019).

Finally, and most importantly, there was adequate presidential oversight over the actions of all FHFA Directors regarding the net worth sweep by virtue of the fact

that all the FHFA's policies relating to its actions as conservator of the Enterprises were "jointly created by the FHFA and Treasury" and the latter's Secretary was removable at will. *Id.* at 594; *see also Collins*, 141 S. Ct. at 1802 (Kagan, J., concurring-in-part and concurring in the judgment) (noting that, because the Fifth Circuit in *Collins* "already considered and decided the issue remanded today," the "lower court proceedings [on remand] may be brief indeed"). Presidents Obama and Trump could have directed the Treasury Secretary to refuse to continue the net worth sweep at any time, but did not do so.

Given all these realities, especially the Supreme Court's description of the extreme limits on the possible relief available to similarly situated shareholders, we agree with the Fifth Circuit that the shareholders have already been afforded the only possible remedy available for Barrett's alleged separation-of-powers violation. We thus conclude that Barrett no longer can assert such a claim on which relief can be granted and that his separation-of-powers claim must also be dismissed under Rule 12(b)(6).

## V. CONCLUSION

For the reasons discussed above, we affirm-in-part because the Claims Court did not err in dismissing shareholders' direct claims and reverse-in-part because the Claims Court improperly failed to dismiss the remaining derivative claims.

## AFFIRMED;

## CROSS-APPEAL REVERSED

COSTS

No costs.